# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 01-1622

LABORERS' PENSION FUND, LABORERS' WELFARE
FUND OF THE HEALTH AND WELFARE DEPARTMENT
OF THE CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY
and JAMES S. JORGENSEN,

*Plaintiffs-Appellants,*

*v.*

A & C ENVIRONMENTAL, INCORPORATED, and
BRYON CLARK, individually and doing business
as A & C ENVIRONMENTAL, INCORPORATED,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 8300—**John W. Darrah**, *Judge.*

ARGUED DECEMBER 5, 2001—DECIDED AUGUST 19, 2002

Before COFFEY, RIPPLE and DIANE P. WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* The Laborers' Pension Fund and
the Laborers' Welfare Fund of the Health and Welfare
Department of the Construction and General Laborers'
District Council of Chicago and Vicinity and the Funds'
administrator, James Jorgensen, (collectively, "the Funds")

brought this action under ERISA section 515, 29 U.S.C. § 1145, and section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, to recover delinquent contributions and union dues allegedly owed to them by A & C Environmental, Inc. ("A & C"). A jury returned a verdict in favor of A & C. The district court denied the Funds' post-trial motion for judgment as a matter of law and entered judgment on the verdict. For the reasons set forth in the following opinion, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

# I

## BACKGROUND

### A. Facts

A & C is a corporation specializing in the transportation and disposal of hazardous and nonhazardous waste. In April 1999, Kopper's Industries asked A & C to bid on a job involving the operation of a coal centrifuge in Gary, Indiana. A & C is not a union company, and Kopper's expressed some concern that, if the job were performed by non-union employees, union workers from U.S. Steel might picket and interrupt service. Bryon Clark, director of field services for A & C,[1] then contacted James Frattini, the President of the Construction and General Laborers' District Council of Chicago and Vicinity ("the Union") Local 75, to determine whether the Union could represent only the five A & C employees who would staff the Gary centri-

---

[1] As director of field services, Mr. Clark quotes prices on projects, issues invoices and oversees the work of employees on projects.

fuge job. Mr. Clark had no previous interaction with Local 75 or Mr. Frattini; he located them by looking in a phone book.

Mr. Frattini assured Mr. Clark that Local 75 could cover his Gary employees and would not have to cover A & C's other employees. Mr. Clark testified that he "had quite a bit of concern" because he knew "if someone goes union, you know, it covers all their company operations." Tr.V at 187. He also testified that Mr. Frattini responded to his concerns: "Well, the union doesn't operate like that anymore. We're here to make money just like you." *Id.* Mr. Frattini subsequently met with Mr. Clark, Carl Grad (President of A & C) and Tom Grad (A & C's director of transportation) and made the same assurances. Mr. Frattini also met with Mr. Clark at A & C's offices to register the Gary employees with the Union. At the meeting, Mr. Frattini and Mr. Clark answered the questions of the Gary employees. While they were answering the questions, Mr. Frattini gave Mr. Clark a one page document and showed him where to sign.[2] The document featured the heading "Collective Bargaining Agreement," centered and in capital letters, and Mr. Clark filled in "A & C Environmental Inc." on a line directly below the heading. App. of Appellants at 129. Nevertheless, Mr. Clark testified that he did not know he was signing a collective bargaining agreement ("CBA"). Mr. Clark believed the document reflected Mr. Frattini's assurances that the Union would only

---

[2] The parties dispute when Mr. Clark signed the collective bargaining agreement with the Union. The Funds point out that the document is dated April 23, 1999, but A & C insists that the final meeting with Mr. Frattini at which Mr. Clark signed the document did not occur until July and that Mr. Frattini had Mr. Clark backdate the contract.

represent the Gary employees. Mr. Clark further testified that he did not have an opportunity to read the document because Mr. Frattini took it from him as soon as he had finished signing. Although his offices had a copy machine, Mr. Clark did not make a copy of the document because he was busy answering his employees' questions, and he "trusted Mr. Frattini's word." Tr.V at 201.

The CBA that Mr. Clark signed states that A & C "affirms and adopts the Collective Bargaining Agreements between the UNION and . . . the Illinois Environmental Contractors Association," and that A & C "agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GEN-ERAL LABORERS' DISTRICT COUNCIL OF CHICA-GO AND VICINITY [and] the LABORERS' PENSION FUND . . . ." App. of Appellants at 129. The Union has a CBA, the "Asbestos Agreement," with the Illinois Environmental Contractors Association. *See* App. of Appellants at 132. That agreement, as well as the one page CBA that Mr. Clark signed, require the employer—A & C, once it signed on—to make to the Welfare and Pension Funds contributions of a certain amount for each hour worked by all employees performing work covered by the agreements, not just those who would work on the Gary, Indiana, job. The Asbestos Agreement provides, "The branches of work covered by this Agreement are: asbestos, abatement laborer duties including . . . the handling, removal, abatement, or encapsulation of asbestos and/or toxic or hazardous waste or materials." App. of Appellants at 152. Mr. Clark acknowledged at trial that A & C's employees performed tasks involving the cleanup of hazardous materials. The CBAs also require the employer to deduct a certain amount from the pay of each employee

covered by the CBA and to remit those dues to the Union. The Union has authorized the Funds to serve as collection agents for the Union with respect to unpaid dues. A & C failed to contribute to the Funds or to remit all of the dues that the Union claimed were due.

## B. District Court Proceedings

The Funds brought suit against A & C and Mr. Clark to recover the delinquent contributions and hired an auditing firm to determine how much A & C owed. Count I of the Funds' complaint sought recovery of the contributions that A & C owed the Funds. In Count II, the Funds—as the designated collection agents of the Union—sought to recover the dues that A & C owed the Union.

The following details of the proceedings before the district court are relevant to the determination of whether the Funds' claims on appeal are procedurally barred. The Funds timely filed a motion for summary judgment. In that motion, it submitted that ERISA entitles the Funds to accept a contract between employers and unions without regard to any oral understandings between employers and unions that conflict with the contract's terms. The court, for reasons undisclosed by the record, declined to rule on the motion. The Funds thereafter filed a motion to convert the summary judgment motion into a motion in limine to exclude evidence relating to any contract formation defense or defenses based on oral side agreements between A & C and the Union. The court denied the motion. The Funds then filed a motion in limine, accompanied by a supporting brief, in which they again requested exclusion of any evidence relating to side agreements. They submitted that our opinion in *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d

1148 (7th Cir. 1989) (en banc), rendered irrelevant any evidence relating to the existence of oral understandings between A & C and the Union that modified the terms of the CBA. In their reply brief to A & C's response to their motion in limine, the Funds specifically contended that *Gerber Truck* foreclosed the defenses of fraud in the inducement and fraud in the execution and that, even if fraud in the execution remained a viable defense to a pension fund's efforts to collect delinquent contributions, A & C had not made out the defense. The district court ultimately granted the motion in limine to exclude evidence relating to the defense of fraud in the inducement,[3] but not evidence

---

[3] In its response to the Funds' motion in limine, A & C had argued that fraud in the inducement was a viable defense to the Funds' claim in Count II for delinquent union dues even if it was not a viable defense to the Funds' claim in Count I for delinquent pension and welfare fund contributions. When asked by the district court just before trial whether A & C was persisting in its defense of fraud in the inducement, A & C stated that it was but only with respect to Count II, the Funds' claim for union dues. The district court reserved the issue then, but returned to the matter the following morning and granted the motion in limine with respect to the defense of fraud in the inducement. The district court based its decision to dismiss the affirmative defense of fraud in the inducement entirely on section 515 of ERISA and cases applying it. Yet, A & C was persisting in the defense only with respect to the Funds' claim in Count II for union dues, which the Funds brought not under ERISA but under section 301 of the LMRA, 29 U.S.C. § 185. Nevertheless, our review of the record reveals that A & C made no objection to the court's ruling at that time.

Because A & C did not object to the district court's decision to bar evidence of fraud in the inducement with respect to

(continued...)

relating to the defense of fraud in the execution. At trial, A & C presented its defense of fraud in the execution, seeking to prove that Mr. Clark had not known that the contract he signed with the Union obligated A & C to make contributions to the Funds and that his ignorance was excusable.

After A & C closed its case, the court heard motions by counsel. The attorney for the Funds announced that they had two motions to make and proceeded to explain the first, a motion for leave to amend the complaint to conform to the evidence. After hearing arguments from counsel, the district court denied it and then added: "The motion for a directed finding or a directed verdict is also denied." Tr.VI at 328. Counsel for the Funds asked if he could "make a record with respect to that second motion," *id.*, and the court invited the Funds to file something if they wanted. The court made clear, however, that it was going to submit the case to the jury whether or not the Funds filed additional material. After this colloquy, the Funds put on rebuttal evidence, which consisted exclusively of a very brief examination of Mr. Clark. At the end of the examina-

---

[3] (...continued) the suit for union dues and because A & C has not argued the point on appeal, that issue is not before us. We note, however, that our decision today does not hold that the protection against certain defenses that ERISA provides in claims by funds for delinquent fund contributions applies as well to claims by funds for union dues.

The only defense that A & C sought to prove at trial with respect to either of the Funds' claims was fraud in the execution. Therefore, our decisions as to the viability of the defense of fraud in the execution and as to whether A & C has proven the defense pertain to both the claim for fund contributions and the claim for union dues.

tion, the Funds voluntarily dismissed Mr. Clark from the suit.

The jury found for A & C on both counts, and the district court entered judgment on the verdict.[4] The court denied the Funds' post-trial motion for judgment as a matter of law ("JMOL") and motion for a new trial in which the Funds argued that fraud in the execution was not a viable defense to the Funds' claim for delinquent contributions and that, even if it was, the evidence did not support the defense. The court held that the defense was valid and that A & C had proven it because a reasonable juror could have believed that Mr. Clark did not know he was signing a collective bargaining agreement and

---

[4] This court has jurisdiction to hear appeals only from "final decisions" of the district courts. 28 U.S.C. § 1291. The entry of judgment does not mention Mr. Clark, and there is no indication whether the dismissal of the Funds' claim against him was with prejudice. "We have held," however, "that an order that effectively ends the litigation on the merits is an appealable final judgment even if the district court did not formally enter judgment on a claim that one party has abandoned." *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 667 (7th Cir. 1986). The Funds have abandoned their claim against Mr. Clark, voluntarily dismissing it before the district court and stating at oral argument that the dismissal was with prejudice. Thus, because the district court's judgment against the Funds and in favor of A & C effectively ends the litigation on the merits, it constitutes a final judgment, and we have jurisdiction to hear the appeal. *See Baltimore Orioles*, 805 F.2d at 667; *Am. Nat'l Bank & Trust Co. of Chicago v. Bailey*, 750 F.2d 577, 580-81 (7th Cir. 1984) (when district court issued orders dismissing several claims against different parties but neglected to rule on one, the orders constituted a final judgment because it was apparent that the unmentioned claim had been abandoned).

that he did not have a reasonable opportunity to review the document.[5]

## II

## DISCUSSION

The Funds submit on appeal, as they did before the district court, that fraud in the execution is not a viable defense to a pension fund's efforts to collect delinquent contributions. They further submit that, even if fraud in the execution is a permissible defense, A & C did not establish that defense at trial. In their view, the district court should have granted their post-trial motion for judgment as a matter of law. Before we can reach the merits of this argument, however, we must address whether this post-trial motion for judgment as a matter of law was preceded by a motion for judgment as a matter of law at the close of all the evidence.

---

[5] The district court also held that the Funds' post-trial motion for JMOL was procedurally barred because it was not filed within ten days of the judgment as required by Fed. R. Civ. P. 50(b). According to the entry date on the docket, the district court entered judgment on December 1, 2000, (it is the entry date as listed in the docket that triggers the time for the filing of the post-trial motion, not the date the judgment was signed, which here was November 30, 2000, *see Darne v. Wisconsin*, 137 F.3d 484, 486 n.1 (7th Cir. 1998)), and the Funds filed their post-trial motion for JMOL on December 13, 2000, twelve days later. In computing periods of time prescribed by the Federal Rules that are less than eleven days, however, intermediate Saturdays and Sundays are excluded. *See* Fed. R. Civ. P. 6(a). Excluding the weekends following December 1, 2000, the Funds' motion was due on December 15, 2000. The motion was therefore timely.

## A. The Rule 50 Motion

The language of Rule 50 suggests that only a motion for JMOL that is made at the close of all the evidence may be renewed post trial. *See* Fed. R. Civ. P. 50(b); *Szmaj v. AT&T Co.*, 291 F.3d 955, 957 (7th Cir. 2002) (stating that the rule "implies (no stronger word is possible) that a motion for judgment as a matter of law must indeed be renewed at the close of all the evidence"). The purpose of requiring that the motion be made after the submission of all the evidence, but before the case is given to the jury, is to afford the opposing party an opportunity to cure any defect in its case before the jury retires. *See Szmaj*, 291 F.3d at 958; *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1388 (7th Cir. 1984).

As we noted in *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132 (7th Cir. 1994): "In the past, this and other courts have not applied this rule rigidly, especially where a directed verdict motion was made at the close of the plaintiff's case and no prejudice has resulted to the non-moving party from the failure to renew." *Id.* at 1139; *see Umpleby v. Potter & Brumfield, Inc.*, 69 F.3d 209, 212 (7th Cir. 1995) (same). *Downes* also observed, however, that the Advisory Committee had reevaluated and amended the Rule in 1991 and "deliberately 'retained the requirement that a motion for judgment be made prior to the close of the trial, subject to renewal after a jury verdict has been rendered.'" *Downes*, 41 F.3d at 1139 (quoting Fed. R. Civ. P. 50, Advisory Committee Notes, 1991 Amendment). Because the Committee "had the opportunity to change the requirements of Rule 50 in the 1991 Amendments, and declined to do so," we concluded in *Downes* that the defendant was precluded from renewing its motion for JMOL because it had failed to bring it at the close of all the evidence. *Id.* at 1139-40.

We reaffirmed *Downes'* strict application of the Rule 50 requirement in *Umpleby* and again in *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353 (7th Cir. 1996), when the defendants had moved for JMOL after the plaintiffs' cases but had failed to renew their motions after all the evidence had been presented. *See Umpleby*, 69 F.3d at 212; *Mogi Trading*, 100 F.3d at 1364. When a defendant moves unsuccessfully for JMOL at the close of the plaintiff's case but does not renew the motion after it has put on its own case, the plaintiff reasonably "may assume that the denial was the end of the matter," *Szmaj*, 291 F.2d at 958, and so will not be alerted to the necessity of curing any defect in its case before the jury retires. This situation was the case in both *Umpleby* and *Mogi Trading*,[6] and so a strict application of the Rule 50 requirement well served the purpose of the Rule. Here, by contrast, the Funds' made their motion—or, more precisely, the district court anticipated their motion and preemptively denied it—after both parties had put on their cases, but before the Funds put on their brief rebuttal evidence.

A & C points to only one case in which we have applied the Rule 50 requirement to block a party's motion for JMOL that had been made after both parties had put on their evidence but not renewed after one of the parties put on rebuttal evidence. *See E. Natural Gas Corp. v. Aluminum*

---

[6] The opinion in *Downes* does not indicate when the defendant last made its motion for JMOL, but as there is no indication that either party offered rebuttal evidence, the motion was made by the defendant and the court referred to this court's prior lenient application of the Rule "where a directed verdict motion was made at the close of the plaintiff's case," *Downes*, 41 F.3d at 1139, the motion was likely made at the close of the plaintiff's case and not renewed.

*Co. of Am.*, (*ALCOA*), 126 F.3d 996, 1000 (7th Cir. 1997). There, however, the moving party had chosen not to take the position on appeal that the denial of its post-trial motion for JMOL had been improper; it conceded at oral argument that *Umpleby* applied. Because the party admitted that it failed to preserve the Rule 50 argument, *see id.*, the court did not have occasion to examine the issue. Nor is there any indication in *ALCOA* of the amount of rebuttal evidence that was offered. Here, however, the rebuttal evidence consisted only of a very brief examination of Mr. Clark and primarily concerned his personal liability, a matter rendered moot when the Funds voluntarily dismissed him as a defendant immediately after his testimony.[7] Furthermore, as a practical matter, the Funds had no realistic opportunity to raise the motion for judgment as a matter of law after the brief rebuttal testimony of Mr. Clark. The district court already had taken the matter under advisement and made crystal clear to the parties that it did not wish to hear further on the matter prior to the case's being given to the jury. Under these circumstances,

---

[7] The only testimony that the Funds elicited from Mr. Clark that related to the Funds' case against A & C, and not Mr. Clark, addressed an allegation in the Funds' complaint. Mr. Clark's previous testimony had pointed out that the Funds' complaint alleged delinquencies dating only from August 1999 and not from April 23, 1999, the date the CBA was signed. During rebuttal, the Funds asked Mr. Clark to look at the complaint and to see if it referred to the conduct of a payroll audit dating back to April 23, 1999, and Mr. Clark said that it did. That paragraph of the complaint alleged that A & C failed to cooperate with the audit. The testimony in this regard was insignificant—neither the court nor the jury needed Mr. Clark to tell it what the complaint alleged—and, in any event, it had no bearing on the Funds' motion for JMOL.

counsel can hardly be expected to have asked that the matter be revisited. Counsel attempted to raise the motion; the court acknowledged its renewal and indicated that it did not need further argument on the matter because, in any event, the matter was going to be submitted first to the jury. *Cf. Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 683 (Fed. Cir. 1990) (failure to make sufficiently specific Rule 50 motion at the close of all the evidence was not fatal when "the court cut short counsel's statement, making clear its view that the issue presented a jury question and that it wanted to move on"). Most importantly, the rationale that animates the need to renew the motion at the close of all evidence—to permit the nonmoving party to cure the defect in its case—simply is not at stake here. *See McKinnon*, 750 F.2d at 1388. In the unruled-upon summary judgment motion, both the court and A & C had been made well aware of the Funds' view of the legal deficiency in A & C's case. Unlike in the cases of *Downes, Umpleby* and *Mogi Trading*, application of the Rule 50 requirement here would serve no purpose but to "create a trap for the unwary." *Szmaj*, 291 F.3d at 958. Therefore, because the purpose of the requirement that a motion for JMOL be made at the close of all the evidence has been served here, the Funds' motion for JMOL made at the close of both parties' cases but before the very brief and largely irrelevant rebuttal evidence served as an adequate basis upon which to renew the motion post trial. In none of our cases have we adopted a mechanistic approach to Rule 50 unsupported by its rationale. We have been insistent on strict compliance with the rule when the reason for the rule is served. We have not demonstrated that same insistence when the rationale of the rule is not well served by such an application. *See Szmaj*, 291 F.3d at 958 (failure to make motion for JMOL at close of all the evidence does not bar post-trial motion for JMOL when

the court has taken the initial motion under advisement because the Rule's "rationale collapses" in such a case). "*Cessante ratione legis, cessat et ipsa lex.*" *Lockhart v. Fretwell,* 506 U.S. 364, 373 (1993); *Goss Graphics Sys., Inc. v. DEV Indus., Inc.,* 267 F.3d 624, 627 (7th Cir. 2001).

A & C also submits that the Funds' pre-verdict motion for JMOL did not preserve its arguments because the motion was not sufficiently specific. Rule 50(a) requires pre-verdict motions for JMOL to "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed. R. Civ. P. 50(a)(2). Of course, the purpose of the rule is to allow the responding party an opportunity to cure any defect in its case before it is submitted to the jury. *See* Fed. R. Civ. P. 50, Advisory Committee Notes, 1991 Amendment. A & C was made well aware of the grounds for the Funds' motion for JMOL by the Funds' various pre-trial motions. The Funds argued in their motion for summary judgment and in their motion in limine that fraud in the inducement and fraud in the execution were not viable defenses to their action to collect the delinquent contributions. They further argued in their reply brief in support of their motion in limine that, even if fraud in the execution remained a viable defense, A & C had not come forward with sufficient evidence to prove it. In short, as counsel for A & C stated at oral argument, and as the record reflects, the Funds had made their arguments "over and over again." Audio Tape of Oral Arguments, No. 01-1622 (Dec. 5, 2001). Therefore, because A & C was made well aware of the bases of the Funds' motion, "the function of Rule 50 has been served and the issue preserved for appeal." *Urso v. United States,* 72 F.3d 59, 61 (7th Cir. 1995) (Government did not forfeit argument for judgment as a matter of law even though it had failed to support its pre-verdict Rule 50 motion with argument, because the same arguments had already been presented to the district court).

A & C submits that this court's opinion in *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276 (7th Cir. 1995), signaled an end to our previously lenient application of the rule by which we "allowed something other than a motion for a directed verdict at the close of evidence to preserve the objection." *Id.* at 1286. We note, however, that *Urso*, cited above, was decided several months after our opinion in *AIC Security*. Nevertheless, in both *AIC Security* and the lenient case whose result the Advisory Committee intended to alter with its 1991 amendment to Rule 50, *Benson v. Allphin*, 786 F.2d 268 (7th Cir. 1986); *see* Fed. R. Civ. P. 50, advisory committee notes, 1991 Amendment, the parties seeking JMOL had failed altogether to make timely pre-verdict motions for JMOL. Here, by contrast, a timely motion for JMOL has been made, and the opposing party and the district court were well aware of the grounds supporting the motion. Therefore, the Funds' arguments for judgment as a matter of law have been preserved for appeal, and we may consider them on the merits.

### B. Claims for Delinquent Contributions and Dues

#### 1.

The Funds submit that fraud in the execution is not a valid defense to a multiemployer pension plan's efforts to collect on delinquent contributions. ERISA section 515, which the Funds seek to enforce, provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

ERISA § 515, 29 U.S.C. § 1145. Congress enacted section
515 because the failure of employers to make promised
contributions imposes costs on plans that adversely affect
beneficiaries. It determined that earlier law for collecting
delinquent contributions had been " 'insufficient and un-
necessarily cumbersome and costly. Some simple collec-
tion actions brought by plan trustees have been converted
into lengthy, costly, and complex litigation concerning
claims and defenses unrelated to the employer's prom-
ise and the plans' entitlement to the contributions.' " *Cent.*
*States, Southeast & Southwest Areas Pension Fund v. Gerber*
*Truck Serv., Inc.*, 870 F.2d 1148, 1152-53 (7th Cir. 1989)
(en banc) (quoting 126 Cong. Rec. 23039 (statement of
Rep. Thompson)). Section 515 was intended to " 'permit
trustees of plans to recover delinquent contributions ef-
ficaciously, and without regard to issues which might arise
under labor-management relations law . . . .' " *Id.* (quot-
ing 126 Cong. Rec. 23039 (statement of Rep. Thompson)).

We therefore concluded in *Gerber Truck* that, with re-
spect to documents in which employers promise to make
contributions to pension funds on behalf of their employ-
ees, section 515 allows pension funds to enforce the writ-
ings according to their terms "without regard to under-
standings or defenses applicable to the original parties
[the employer and the union]." *Gerber Truck*, 870 F.2d at
1149. That is, where, as here, an employer has signed a
CBA in which it promises to contribute to a pension fund,
the "pension fund's reliance upon the terms of the CBA may
not be thwarted . . . by defenses that may defeat enforce-
ment of the CBA between the employer and the union."
*Cent. States, Southeast & Southwest Areas Pension Fund v.*
*Kroger Co.*, 73 F.3d 727, 731 (7th Cir. 1996). Thus:

> If the employer simply points to a defect in [the con-
> tract's] formation—such as fraud in the inducement,

oral promises to disregard the text, or the lack of ma-
jority support for the union and the consequent inef-
fectiveness of the pact under labor law—it must still
keep its promise to the pension plans.

Anything less may well saddle the plans with un-
funded obligations.

*Gerber Truck*, 870 F.2d at 1153.

As we concluded in *Gerber Truck*, section 515 clearly
forecloses the defense of fraud in the inducement. A & C
submits, however, that *Gerber Truck* does not foreclose the
defense of fraud in the execution. "Fraud in the induce-
ment" occurs when fraud induces a party to assent to
a commitment that the party understands but to which
the party would not otherwise have assented; the prom-
isor knows what it is signing but its assent is induced
by fraud. "Fraud in the execution," by contrast, entails
deceiving a party to an agreement as to the very nature
of the instrument it signs so that the party "actually does
not know what he is signing, or does not intend to enter
into a contract at all." *Rosenthal v. Great Western Fin. Sec.
Corp.*, 926 P.2d 1061 (Cal. 1996); *see Southwest Adm'rs, Inc.
v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986); 12
*Williston on Contracts* § 1488, at 332 (3d ed. 1970). "Fraud in
the execution results in the agreement being void *ab initio*,
whereas fraud in the inducement makes the transac-
tion merely voidable." *Rozay's Transfer*, 791 F.2d at 774;
*see Rosenthal*, 926 P.2d at 415; 12 *Williston on Contracts* § 1488,
at 332.

Several circuits have recognized fraud in the execution
as a viable defense to suits by funds to collect delinquent
contributions under ERISA because fraud in the execu-
tion renders the collective bargaining agreement void
rather than merely voidable. *See Louisiana Bricklayers &*

*Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.*, 157 F.3d 404, 408 (5th Cir. 1998); *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992); *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir. 1990); *Rozay's Transfer*, 791 F.2d at 774 (9th Cir.). The distinction between void and voidable contracts and a fund's ability to enforce a contract makes sense, because when a contract is void, it is as if it never existed. *See Operating Eng'rs Pension Trust v. Gilliam*, 737 F.2d 1501, 1505 (9th Cir. 1984) (where employer's signature on CBA is procured by fraud in the execution, it is as though "no collective bargaining agreement exists").

> Where a person is fraudulently induced to sign or endorse a bill or note in the reasonable belief that he is signing something else, he cannot really be said to have made or indorsed the bill or note; hence the ancient plea of *non est factum* is applicable. He is in effect stating that this is not his contract; in fact, it is not a contract at all.

12 *Williston on Contracts* § 1488, at 333.

A promisor's signature procured by fraud in the execution gives no more effect to a contract than a promisor's signature that has been forged. In either case the contract is void; it has never had any legal effect. *See Andrews v. Tallman*, 131 A. 50, 51 (R.I. 1925) ("[U]nder the plea of non est factum [a defendant] may be entitled to prove fraud in the execution of the bond whereby the instrument never had a legal existence as in cases of forgery . . . ."); *Crocker v. Bellangee*, 6 Wis. 645, 1858 WL 2281, at 11 (Wis. 1858) ("[A void contract] is null *ab initio*, and the subject of it may be bought, sold, or otherwise dealt with, in all respects precisely as though it had never been—for it never hath been of any force. Instance, a forged or stolen deed, or a deed obtained by fraud in the execution . . . ."). Con-

gress surely did not mean to allow pension funds to collect contributions from employers whose signatures had been forged on instruments containing collective bargaining agreements, and it is no more likely that it intended to allow funds to collect on contracts that are void because of fraud in the execution.

This principle is consistent with our observation in *Gerber Truck* that "[t]he pension or welfare fund is like a holder in due course in commercial law, . . . entitled to enforce the writing without regard to understandings or defenses applicable to the original parties." *Gerber Truck,* 870 F.2d at 1149. Fraud in the execution is a viable defense to collection efforts by a holder in due course. *See* U.C.C. § 3-305(a)(1)(iii) (1991). Because an employer's assent procured by fraud in the execution renders the agreement void and the purported contract between the employer and the Union nonexistent, section 515 does not foreclose the defense of fraud in the execution to actions by pension funds to collect delinquent contributions.

**2.**

Although fraud in the execution is a viable defense under ERISA section 515, A & C has not made out the defense. In order to establish the defense of fraud in the execution, A & C had to prove that it did not know that it was signing a collective bargaining agreement that obligated it to make contributions to the Funds and that its ignorance was excusable because it had reasonably relied upon the representations of the union representative. *See Ill. Conf. of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking,* 71 F.3d 1361, 1365-66 (7th Cir. 1995); *Rozay's Transfer,* 791 F.2d at 774; *see also* U.C.C. § 3-305(a)(1)(iii) (negotiable instruments). The Funds do not contest that the

Union representative, Mr. Frattini, misrepresented the nature of the contract to Mr. Clark. They submit, however, that Mr. Clark's ignorance of the nature of the contract was inexcusable because he had a reasonable opportunity to review the document. A & C, on the other hand, submits that Mr. Clark did not have a reasonable opportunity to review the contract because Mr. Frattini asked him to sign the contract while Mr. Clark was answering the questions of eager employees and then took the contract from Mr. Clark as soon Mr. Clark had finished signing it. The agreement was in front of Mr. Clark for only one or two minutes.

A & C submits that the Ninth Circuit found fraud in the execution under what it believes are very similar circumstances. In *Gilliam*, an owner-operator of a construction company, Gilliam, wanted to join the union so that he could operate his bulldozer on a job on which the workers were unionized. *See* 737 F.2d at 1502-03. The union representative gave Gilliam several documents to sign and represented that they were standard owner-operator forms for becoming a member of the union. *See id.* at 1504. In fact, however, the documents contained a collective bargaining agreement that obligated his company to make pension fund contributions for its workers. Gilliam did not read the documents, but merely relied on the union representative's word. The Ninth Circuit concluded that no binding agreement was created because Gilliam did not know what he signed and his ignorance was reasonable. *See id.* at 1505.

We think that the situation before us is significantly different. As the Ninth Circuit noted at the beginning of its discussion, the facts of that case are "unusual." *Gilliam*, 737 F.2d at 1502. There, the signing party was totally mislead as to the nature of the document he was signing. The

employer was given several documents to sign that had already been filled out by the union representative, and he was told that the documents were standard forms signed by owner-operators who wanted to join the union, when in fact the documents covered an entirely different subject matter—a collective bargaining agreement. Here, by contrast, Mr. Clark was given a one-page form, which he filled out himself, writing the name of the company directly below the caption, "COLLECTIVE BARGAINING AGREEMENT." App. of Appellants at 129. Moreover, the record reveals that Mr. Clark was well aware of the fact that the act he was undertaking usually entailed the very result that occurred—the inclusion of all of the company's operations, not just the work of a few employees, under any contract with the Union. That possibility had been the subject of a previous discussion in which he expressed his concerns to Mr. Frattini that if a company "goes union . . . it covers all their company operations." Tr.V at 187. Mr. Clark, therefore, should have been on the lookout for just such a clause in the document he was signing. It was not reasonable for Mr. Clark to forego the opportunity to review the document. A & C points out that Mr. Clark only had a high school education, but as a representative of A & C with the power to enter into contracts for the company, Mr. Clark ought to have known not to sign something on behalf of the company without reading it first. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome.").[8]

---

[8] In *Paper Express, Ltd. v. Pfankuch Maschinen*, 972 F.2d 753 (7th Cir. 1992), this court enforced the terms of a forum selec-
(continued...)

Here, Mr. Clark signed a one-page document written in English and entitled "Collective Bargaining Agreement." A & C maintains that Mr. Clark did not know what a collective bargaining agreement was; he should have found out. *See Paper Express, Ltd. v. Pfankuch Maschinen*, 972 F.2d 753, 757 (7th Cir. 1992) ("[E]ven though Paper Express may not be fluent in German, we are confident that with the aid of a German-English dictionary, or, even better, a translator, Paper Express could have mastered the rules of [the forum selection clause]."). A & C insists that Mr. Clark did not understand that the contract would require the company to contribute to the pension funds; if he had reviewed the single page he would have learned that it did. In short, Mr. Clark's ignorance of the nature of the contract was not excusable. Thus, as a matter of law, A & C did not prove fraud in the execution; it simply has failed to show that there was any reasonable basis for Mr. Clark's reliance on the earlier representations of the union representative.

---

[8] (...continued)

tion clause where the party opposing its enforcement had not read the clause before signing the contract. There, the only reference in the contract to the forum selection clause was in a brief warranty clause referring to another document and the forum selection clause was written in German and in extremely fine print. *Id.* at 754. Nevertheless, the court noted that "it is a fundamental principal of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." *Id.* at 757. Even the fact that the rules were in German did not preclude enforcement. "In fact, a blind or illiterate party (or simply one unfamiliar with the contract language) who signs the contract without learning of its contents would be bound." *Id.*

**3.**

A & C also submits that the jury reasonably could have concluded that A & C's employees had not performed work covered by the Asbestos Agreement. We disagree. Paragraph 4(a) of the Asbestos Agreement, entitled "Scope of Work," provides that the "branches of work covered by this Agreement" include "the handling, removal, abatement, or encapsulation of asbestos and/or toxic or hazardous waste or materials." App. of Appellants at 152. Covered work further includes "the operation of all tools and equipment: including, but not limited to, generators, compressors, and vacuums used in the removal and abatement of toxic or hazardous waste or materials," and "all other work incidental to the handling, removal, control, abatement, disposal and/or encapsulation of asbestos and/or toxic or hazardous waste or materials." *Id.* Paragraph 4(b) defines hazardous waste duties to include "overpacking . . . and general clean-up of leaked materials or chemicals . . . ." *Id.* Although Mr. Clark testified that A & C has never employed asbestos laborers, he also testified that A & C employees handle hazardous materials,[9] that they have done overpacking, that they have cleaned spilled materials off of floors and that they use air compressors to clean walls, floors and vessels with a "$CO_2$ blaster." Tr. VI at 240.

Judgment as a matter of a law is appropriate on a particular issue if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party on that issue . . . ." Fed. R. Civ. P. 50(a). The Asbestos Agree-

---

[9] Overpacking entails "taking a drum that is leaking or bent or in bad shape and putting it inside a larger plastic drum so in transportation it doesn't leak." Tr. VI at 242 (testimony of Mr. Clark).

ment unambiguously covers work with hazardous materials other than asbestos. No reasonable juror could have concluded, therefore, that A & C's employees did not perform work covered by the Asbestos Agreement. The Funds have presented uncontroverted evidence that A & C signed the CBA, that the CBA obligated A & C to contribute a certain amount of money to the Funds based on the amount of covered work performed by A & C's employees, and that A & C employees performed work covered by the CBA.

With respect to the delinquent union dues, A & C does not challenge the evidence showing that the CBA obligated it to remit dues to the Union, that A & C failed to do so, and that the Funds have authority to collect the delinquent dues. Therefore, because A & C has not controverted the evidence establishing its liability to pay contributions and union dues, and, because it cannot prove the defense of fraud in the execution, the Funds were entitled to judgment as a matter of law on both claims.

### 4.

The Funds submit that they are entitled to judgment not only on the question of A & C's liability but on the amount of damages as well. According to the Funds, the auditor's report detailing the amount of delinquent contributions that A & C owes is entitled to a presumption of correctness, which A & C has the burden to rebut, because A & C failed to maintain records adequate to establish the precise number of hours of covered work that its employees performed. The Funds rely on cases from three other circuits holding that if a pension or welfare fund has proven that an employer is liable for delinquent contributions, and the employer has failed to keep records

that would allow the fund to calculate the precise amount of contributions owed, then the burden shifts to the employer to come forward with evidence of the precise amount of covered work (work covered by the CBA) performed by its employees or to come forward with evidence to challenge the accuracy of the fund's calculations. *See Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.,* 30 F.3d 692, 695-96 (6th Cir. 1994); *Brick Masons Pension Trust v. Indus. Fence & Supply, Inc.,* 839 F.2d 1333, 1337-39 (9th Cir. 1988); *Combs v. King,* 764 F.2d 818, 825-27 (11th Cir. 1985). The rule operates to relieve the plaintiff fund of its burden to prove precisely how much of the work performed by the defendant's employees was covered work when the employer has failed to keep records that would have allowed the fund accurately to calculate such damages. *See Brick Masons,* 839 F.2d at 1338-39. For example, in *Brick Masons* and *Grimaldi,* the funds had proven that at least some of the total amount of work performed by the defendants' employees was covered work, but it was impossible to determine how much work because the employer had breached its statutory duty to keep records from which such a determination could have been made. *See Grimaldi,* 30 F.3d at 694; *Brick Masons,* 839 F.2d at 1336. The remedy in such a case is to award the fund contributions for all of the hours worked, unless the employer can show that some of the hours were not spent doing covered work. *See Grimaldi,* 30 F.3d at 696-97; *Brick Masons,* 839 F.2d at 1339. The court explained the rationale behind the burden-shifting rule in *Brick Masons*:

> The records that employers are required to keep by . . . ERISA may be the only evidence available to employees to prove that their employers have failed to compensate them in accordance with the statute. An employer cannot escape liability for his failure to pay his employees the wages and benefits due to them under

the law by hiding behind his failure to keep records as statutorily required.

*Id.* at 1338.

The rule prevents summary judgment against a fund when the fund is unable to prove damages with specificity because of the employer's failure to keep adequate records. We previously have held, however, that this rule does not apply to compel judgment against an employer when the employer raises a genuine issue of material fact as to the accuracy of the fund's calculation. *See Illinois Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking,* 71 F.3d 1361, 1367 (7th Cir. 1995) (employer's failure to come forward with documentary evidence establishing amount of covered work performed was not fatal in effort to oppose fund's motion for summary judgment when factual issues remained as to the amount owed).

Unlike the situation in *Combs, Brick Masons* and *Grimaldi,* the entirety of the award of contributions that the Funds seek is based on what the auditor determined to be covered work. Neither the Funds nor A & C claim that A & C's records were inadequate to allow the auditor to determine whether the hours included in the report were spent on covered work.[10] Therefore, because A & C's records were adequate to permit the Funds' auditors to determine

---

[10] The Funds claim that A & C's records were inadequate because some documents—a cash disbursement journal, possibly some work orders, and a certain payroll register—were missing and these documents might reveal the existence of additional workers, not included in the auditor's report, who performed covered work. Because the Funds only seek the amount of delinquent contributions identified in the report, however, these supposed inadequacies have no bearing on the amount of contributions they hope to recover.

the amount of covered work that A & C employees performed and based on which the Funds seek contributions, the *Combs-Brick Masons* burden-shifting rule does not apply.

The Funds have made no other argument in support of their position that they are entitled to judgment as a matter of law on the issue of damages. The question of how much of the work performed by A & C employees was covered under the collective bargaining agreements is a question of fact appropriately resolved in the district court. We therefore remand the case to the district court for the determination of damages.

## Conclusion

Because A & C has not controverted the evidence establishing its liability to the Funds for the delinquent contributions and union dues, and because A & C did not prove the defense of fraud in the execution, the Funds are entitled to judgment as a matter of law. We therefore reverse the district court's denial of the Funds' motion for judgment as a matter of law and remand the case to the district court for the determination of damages. The Funds may recover their costs of this appeal.

REVERSED AND REMANDED

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*