Tracey **LUST**, Plaintiff,

v.

**SEALY, INC.**, Defendant.

No. 02–C–50–C.

United States District Court,
W.D. Wisconsin.

Aug. 19, 2003.

974

Robert J. Gingras, Gingras, Cates & Luebke, S.C., Madison, WI, for Tracey Lust.

Lauri D. Morris, Quarles & Brady, Madison, WI, for Sealy, Inc.

## OPINION AND ORDER

CRABB, District Judge.

■ This is a sex discrimination case brought pursuant to Title VII of the Civil Rights of Act of 1964, as amended, 42 U.S.C. § 2000e, and the Equal Pay Act, 29 U.S.C. § 206(d). Plaintiff Tracey Lust alleged that defendant Sealy, Inc. violated Title VII when it passed her over for a promotion in favor of a male. In addition, she alleged that defendant violated the Equal Pay Act by paying her less than males who performed equivalent work. In an opinion and order dated December 30, 2002, I granted defendant's motion for summary judgment in part and dismissed plaintiff's claim under the Equal Pay Act because she had failed to set forth specific facts showing that she and similarly situated males had received different rates of pay. However, I denied defendant's motion to dismiss plaintiff's Title VII claim because I concluded that a reasonable jury could find that defendant had discriminated against plaintiff on the basis of sex. A jury found defendant liable, awarding plaintiff $1500 in back pay, $100,000 for emotional distress and $1 million in punitive damages. In a judgment entered on February 25, 2003, I reduced the award to $301,500 pursuant to 42 U.S.C. § 1981a(b)(3). The statute limits punitive damages and certain types of compensatory damages to a total of $300,000, but the limitation does not include back pay. *See Pals v. Schepel Buick & GMC Truck, Inc.,* 220 F.3d 495, 499 (7th Cir.2000).

Presently before the court are several motions filed by defendant to (1) enter judgment as a matter of law under Fed. R.Civ.P. 50(b) in favor of defendant on both liability and damages; (2) grant a new trial under Fed.R.Civ.P. 59(a) because the jury's verdict was against the greater weight of the evidence and because this court made erroneous evidentiary rulings that unfairly prejudiced defendant; and (3) amend the jury's verdict on both liability and damages under Fed.R.Civ.P. 59(e) and 60(b)(6). All of defendant's motions will be denied. First, I conclude that there was sufficient evidence for the jury to find that defendant's articulated reasons for not promoting plaintiff were pretextual and that defendant discriminated against plaintiff because of sex. Second, defendant has not shown that the jury's verdict was against the greater weight of the evidence or that the jury's decision was significantly influenced by any erroneous evidentiary rulings. Third, although the jury's damage awards were substantial, I cannot conclude that they must be reduced further than required under § 1981a(b)(3).

## BACKGROUND

Defendant Sealy, Inc. hired plaintiff Tracey Lust as a sales coordinator in Madison, Wisconsin, in 1992. The following year defendant promoted her to territory manager 1. In 1995, it promoted her to territory manager 2. Plaintiff remained in Madison for both promotions.

After becoming a territory manager 2, plaintiff began telling her supervisor, Scott Penters, that she wanted to become a key account manager, which was the next level of promotion. Beginning in 1998, Penters began recommending to Al Boulden, the central region vice-president of sales, that plaintiff receive a promotion to key account manager. In fall 1999, Penters wrote a memo to Boulden, recommending plaintiff for a promotion again. Boulden did not promote plaintiff at this time.

In summer 2000, a key account manager position became available in Penters's

sales district. The job was located in Chicago, Illinois and would service the account of a large retailer called Bedding Experts. Although plaintiff was initially on the list of candidates to fill the position, Penters's sole recommendation to Boulden for the promotion was Steve West, who had been a territory manager 2 since 1997. Boulden chose West.

After West was promoted in July 2000, Boulden and Penters transferred plaintiff to West's former territory, which was located in Madison and serviced the American TV account. Plaintiff remained a territory manager 2. When she received her evaluation from Penters in August 2000, she wrote in the employee comments section that she believed she had not been promoted because of gender discrimination. Plaintiff's comments were forwarded to Boulden, who spoke with plaintiff about her accusation on August 28, 2000. The following day, Boulden decided to promote plaintiff to key account manager. On September 26, 2000, Boulden gave plaintiff the option of being promoted on the American TV account or moving to Chicago on a different account. Plaintiff chose to stay with the American TV account.

## OPINION

### I. LIABILITY

#### A. *Rule 50(b) Motion*

■ Defendant argues first that no reasonable jury could find that defendant discriminated against plaintiff because of her sex and it is therefore entitled to judgment as a matter of law. Defendant brings its motion under Fed.R.Civ.P. 50(b), which provides:

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment— and may alternatively request a new trial under Rule 59.

A potential problem raised by this rule is that defendant never moved for judgment as a matter of law "at the close of all the evidence." Although defendant *did* make such a motion after plaintiff rested, the court of appeals has stated repeatedly that this is insufficient to satisfy the requirements of Rule 50. Rather, a party must move for judgment as a matter of law at the close of evidence or it waives the right to file a renewed motion after the jury returns its verdict, even if the party's failure does not prejudice the other side. *Laborers' Pension Fund v. A & C Environmental, Inc.,* 301 F.3d 768 (7th Cir.2002); *Mid–America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1363–64 (7th Cir.1996); *Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1139–40 (7th Cir.1994). The court of appeals has continued to adhere to this rule even while recognizing that other circuits "have taken a more forgiving view of harmless violations of the renewal requirement." *Szmaj v. American Telephone & Telegraph Co.,* 291 F.3d 955, 957 (7th Cir.2002).

■ Defendant's failure to move for judgment as a matter of law would appear to require a denial of its Rule 50 motion, except for one thing. Plaintiff did not raise this argument in its brief with respect to liability. The requirements for preserving a Rule 50 motion are not self-enforcing; they are there to protect the non-moving party from a surprise motion that is not filed until it is too late to put in more evidence. *Id.* Thus, plaintiff's failure to assert its right means that it has waived the issue. *See Collins v. State of Illinois,* 830 F.2d 692, 698 (7th Cir.1987) (non-moving party waived requirement of Rule

50(b) when it failed to raise argument in trial court). I will address defendant's motion on its merits.

### 1. *Rule 50 standard*

■ In many ways, a motion for judgment as a matter of law is a replay of a motion for summary judgment. The fundamental question in deciding either motion is the same: on the basis of all the evidence presented, could a reasonable jury find in favor of the non-moving party? *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The only difference is that, in deciding a Rule 50 motion, the court has the benefit of viewing the evidence as it has developed since summary judgment. *Massey v. Blue Cross–Blue Shield of Illinois,* 226 F.3d 922, 924 (7th Cir.2000).

■ In determining whether there is sufficient evidence to sustain the jury's verdict, I must view the evidence in the light most favorable to plaintiff. *David v. Caterpillar,* 324 F.3d 851 (7th Cir. 2003). Furthermore, in reviewing the jury's verdict, I may not assess whether the defendant's witnesses were more credible or persuasive. *Massey,* 226 F.3d at 924. Although a court must view the record as a whole, "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2529, at 300 (2d ed.1995)). The court should "give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* Therefore, I may not substitute my judgment for the jury's, even if I believe the jury's verdict is incorrect. Plaintiff's evidence need not be "overwhelming." *David,* 324 F.3d at 858. So long as *a* reasonable view of the evidence (not necessarily the *most* reasonable) supports the jury's findings, then defendant's motion for judgment as a matter of law must be denied.

■ Before addressing the merits of defendant's motion, it is important to take note of the Supreme Court's recent decision, *Desert Palace, Inc. v. Costa,* —— U.S. ——, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), which was decided after the trial in this case. In *Desert Palace,* the Court clarified what a plaintiff must do to prove that an employer "discriminate[d]" against her "because of" sex (or race, etc.). Under 42 U.S.C. § 2000e–2(m), which was enacted as part of the Civil Rights Act of 1991, to establish liability in a sex discrimination case, a plaintiff must "demonstrate" by a preponderance of the evidence that her sex was a "motivating factor" in the adverse employment decision. Once a plaintiff has done this, the burden shifts to the employer to prove, also by a preponderance, that it would have taken the same action regardless of the plaintiff's gender. *Id.* If the employer proves this, the plaintiff's relief is limited to "declaratory relief, certain types of injunctive relief and attorney's fees and costs." *Desert Palace,* 123 S.Ct. at 2151.

The question the Supreme Court answered in *Desert Palace* was whether a plaintiff must present *direct* evidence that sex was a "motivating factor" in order to establish partial liability and shift the burden of persuasion to the defendant. Relying on Justice O'Connor's concurring opinion in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), many courts, including the Court of Appeals for the Seventh Circuit in some cases, had held or implied that direct evidence was required. *See Frobose v.*

*American Savings and Loan Association of Danville,* 152 F.3d 602 (7th Cir.1998); *Pilditch v. Board of Education of City of Chicago,* 3 F.3d 1113, 1116 (7th Cir.1993); *see also Venters v. City of Delphi,* 123 F.3d 956 (7th Cir.1997) (noting Civil Rights Act of 1991 had "supplanted" *Price Waterhouse* but still assuming that direct evidence was required to shift burden to defendant). In the absence of direct evidence, the plaintiff could not shift the burden to the defendant and would have to prove that the defendant would not have taken adverse action against her "but for" the protected characteristic. *See Mills v. Health Care Service Corp.,* 171 F.3d 450, 456 (7th Cir.1999); *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1113 (7th Cir.1992); *but see Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1350–51 (7th Cir.1995) (stating in dicta that direct evidence is not required to receive jury instruction under § 2000e–2(m)). In *Desert Palace,* the district court had instructed the jury that if it concluded that the plaintiff had proved that sex was a "motivating factor" in the defendant's treatment of her, it should award her compensatory damages unless the defendant could prove that it would have treated her the same even if sex had played no role in its decision. *Desert Palace,* 123 S.Ct. at 2152. The instruction did not distinguish between direct and circumstantial evidence. The employer argued that the instructions were erroneous because the plaintiff did not have any direct evidence of discrimination.

The en banc court of appeals agreed with the district court, as did the Supreme Court. The Court concluded that regardless whether *Price Waterhouse* required direct evidence, Congress abrogated the holding in that case by enacting the Civil Rights Act of 1991, which makes no distinction between direct and circumstantial evidence. *Desert Palace,* 123 S.Ct. at 2153–54. A plaintiff is entitled to an instruction under § 2000e–2(m) whenever she has "present[ed] sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex or national origin was a motivating factor for any employment practice.'" *Desert Palace,* 123 S.Ct. at 2155 (quoting 42 U.S.C. 2000e–2(m)).

In this case, I did not provide an instruction under § 2000e–2(m), although plaintiff requested one. *See* Trial Tr. Day Two, dkt. # 115, at 282. Instead, the jury was asked: "If Tracey Lust had been a man, and everything else remained the same, would defendant Sealy, Inc. have promoted her to the Bedding Experts position in summer 2000?" Special verdict on liability, dkt. # 99. Thus, plaintiff was required to prove both that sex was a motivating factor in defendant's decision not to promote her and that defendant would have promoted her if she had been a man. In light of *Desert Palace,* this may have been error. However, I need not consider whether or how the Supreme Court's decision bears on this case because I conclude that defendant is not entitled to judgment as a matter of law even under the standard on which the jury was instructed.

### 2. Evidence at trial

One way of proving a case of discrimination is to show that the defendant's explanation for its conduct is unworthy of credence. *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097. Plaintiff could also prove her case by presenting other circumstantial evidence showing that she was denied the promotion because of her sex, such as "'ambiguous statements,'" "'suspicious timing'" or "'other bits and pieces from which an inference of discriminatory intent might be drawn.'" *Venturelli v. ARC Community Services, Inc.,* 336 F.3d 606, 615 (7th Cir.2003) (quoting *Troupe v. May*

*Department Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994)). In this case, both types of evidence are present.

Two individuals were involved in deciding who would receive the Chicago promotion: Scott Penters and Al Boulden. In summer 2000, when the promotion decision was made, Penters was a district sales manager and the supervisor of both plaintiff and Steve West. Boulden was the central region vice-president of sales. Any time a promotion opportunity became available within Penters's sales district, Penters made a recommendation to Boulden, who made the final decision. (Although individuals who found out about an open position could express interest in it, defendant did not officially announce promotion opportunities and it had no formal application process. Boulden testified that he did not want "to worry the sales force with an opening" and that he did not want "speculation about what we're doing." Trial Tr. Day One, dkt. # 123, at 63. None of the employees considered for the Chicago promotion approached Penters or Boulden about the position.) When the Bedding Experts account opened up in summer 2000, Penters's only recommendation to Boulden was West.

a. Penters's reasons for not choosing plaintiff

1) first reason: willingness to move

■ Evidence at trial showed that Penters believed plaintiff was qualified to be promoted to key account manager. Penters testified that he had been recommending plaintiff for such a promotion since 1998. Trial Tr. Day Two, dkt. # 115, at 71. According to Penters, the "initial" reason he chose not to recommend plaintiff was that he believed plaintiff did not want to move from Madison to Chicago. Trial Tr. Day One, dkt. # 123, at 150. However, there was sufficient evidence for the jury to find that this was not the true reason

or, to the extent that it was, that Penters's belief was based on sex stereotypes.

Penters admitted at trial that plaintiff had never told him she was unwilling to move. Rather, plaintiff testified that she had told Penters repeatedly that she wanted to be promoted and she asked what she needed to do in order to achieve this goal. Trial Tr. Day One, dkt. # 123, at 206; *see also* Trial Tr. Day Two, dkt. # 115, at 55 (testimony of Scott Penters) ("she made it very clear to me fairly early on that she wanted to be a key account manager"). Because there were no promotions available in Madison at the time, an expressed desire to be promoted would suggest a willingness to move if necessary. When West told Penters that he wanted more direction on how to get promoted, Penters concluded that this meant West "was very interested in any promotion in any location in the United States." Trial Tr. Day Two, dkt. # 115, at 88. Penters did not explain why he drew two very different inferences from similar conversations with plaintiff and West. Thus, there was sufficient evidence for the jury to conclude that this reason was pretextual. (Unlike Boulden, Penters testified that he did not rely on plaintiff's relocation chart in concluding that she did not want to move. Trial Tr. Day Two, dkt. # 115, at 153. Therefore, I will save consideration of the chart until examining Boulden's reasons for not choosing plaintiff for the promotion.)

Plaintiff argued at trial that to the extent Penters truly believed she did not want to move, this assumption was based on sex stereotypes. Plaintiff testified that when she asked Penters why she did not receive the promotion, Penters responded, "You have kids." Trial Tr. Day One, dkt. # 123, at 215. Although Penters testified that it was plaintiff who brought up the issue of children, he admitted that he did tell her that he believed she would not

move from Madison to Chicago because of her family. Trial Tr. Day One, dkt. # 123, at 165. He later testified that he thought plaintiff "was quite happy in Madison" because "she had a family there," Trial Tr. Day Two, dkt. # 115, at 55, and believed she did not want to move in part because "she had gotten married," Trial Tr. Day Two, dkt. # 115, at 99. Again, Penters admitted that plaintiff did not tell him she was opposed to moving because of her husband or children. Trial Tr. Day One, dkt. # 123, at 166.

Defendant is correct that discrimination based on family or marital status is not the same thing as sex discrimination. Even if plaintiff was denied a promotion because of her family, this would not necessarily violate Title VII, which prohibits discrimination because of sex, not because an employee has a spouse or children. However, as the court of appeals recognized long ago, in enacting Title VII, "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir.1971) (quoted in *City of Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 708 n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)). If Penters decided that plaintiff would not (or should not) move because she was a *woman* with a family, then he engaged in sex stereotyping. Denying a woman a promotion because of a stereotypical belief about her obligation to her family is discrimination because of sex. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (policy of not hiring women with young children violated Title VII); *Loyd v. Phillips Brothers, Inc.*, 25 F.3d 518, 524 (7th Cir.1994) ("[S]tereotypical attitudes about women are not legitimate 'reasons' for treating them differently from men."); *Reidt v. County of Trempealeau*, 975 F.2d 1336, 1340 (7th Cir.1992) ("Stereotypical notions

of a female's abilities, however, or unwarranted modesty, is not sufficient to justify a male-only position.").

The question is whether it would be reasonable for a jury to conclude that Penters's statement about plaintiff's family was a reflection of a stereotypical view of women. Although the court of appeals has held that comments about a woman's family, without more, do not prove that a decision maker relied on sex stereotypes, *Bruno v. City of Crown Point, Indiana*, 950 F.2d 355, 362 (7th Cir.1991) (questions to applicant about her children and child care were not evidence of sex discrimination by themselves), it has also recognized repeatedly that even comments that do not refer expressly to a protected characteristic may indicate bias. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1045 (7th Cir.1999) (statement of "[h]opefully this will give you some time to spend with your children" when firing plaintiff was direct evidence of pregnancy discrimination); *Futrell v. J.I. Case*, 38 F.3d 342, 347 (7th Cir.1994) (reasonable jury could find that statement that older employee was not "a forward enough thinker" reflected age bias); *see also Costa v. Desert Palace, Inc.*, 299 F.3d 838, 861 (9th Cir.2002) (en banc) (reasonable jury could find that statement by defendant that plaintiff did not deserve overtime because she did not have family to support meant that defendant's decision "was based on her not being a male breadwinner"). It cannot be denied that, traditionally, a predominant belief has been that women are and should be the family's primary caregivers and that they do and should subordinate their career aspirations to their family responsibilities. As the Supreme Court noted recently, it was the pervasive and enduring nature of such stereotypes that prompted Congress to pass the Family and Medical Leave Act. *Nevada Department of Human Resources v. Hibbs*, —— U.S. ——, ——, 123 S.Ct.

1972, 1979, 155 L.Ed.2d 953 (2003) (discussing finding of Congress that differential leave policies for men and women were attributable to "the pervasive sex-role stereotype that caring for family members is women's work"); *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 133, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (noting Court's previous view that "the paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother") (internal quotations omitted). With this background, it does not require an enormous inferential leap to attribute Penters's assumption about plaintiff's wishes to a belief that women would or should make family their first priority.

However, the jury had more to rely on than just the history of stereotypical attitudes held toward women. First, Penters testified that the person who took over the Steinhafels' account after plaintiff was a male who had moved from Milwaukee to Chicago with his family, which supports an inference that Penters's assumption about plaintiff's desire to move with her family was not extended to men with families. Trial Tr. Day Two, dkt. # 115, at 163. Also relevant is testimony by plaintiff regarding a conversation that she had with Penters after she was married in 1998. While she was discussing a potential promotion to key account manager with Penters, he expressed surprise and asked her "why Jerry [her husband] wasn't going to take care of" her. Trial Tr. Day One, dkt. # 123, at 203. If believed by the jury, this statement suggests that Penters held an outdated view of the roles of men and women. It would also support an interpretation of his statements about plaintiff's family as an expression of a stereotypical attitude toward women rather than a mistaken perception that no one with a family would want to move in order to be promoted.

This interpretation is further supported by other statements that Penters made at district sales meetings. Plaintiff testified that when she made a comment or asked a question at one of these meetings, Penters would often respond by rolling his eyes and making comments such as, "Oh, it's just like a woman," "Oh, you're just being a blonde today," or "You're acting like a blonde." Trial Tr. Day One, dkt. # 123, at 199. (Penters admitted that he made "blonde" comments, but he denied making statements such as "It's just like a woman." Trial Tr. Day Two, dkt. # 123, at 50.) Again, these comments support a finding that Penters had a condescending or dismissive view of women. "[A] reasonable jury would not be required to accept a proferred innocent construction of the remarks we are discussing, even if it might rationally have done so." *Sheehan*, 173 F.3d at 1045.

Defendant argues that Penters's comments are not probative for several reasons. First, it argues that the comments had subsided well before summer 2000 and were not related to the decision not to promote plaintiff. It cites the testimony of Penters, who stated that he stopped making "blonde jokes" in 1997. It also cites the testimony of West and Josie Roberts, another Sealy employee who used to work in Penters's district, both of whom said that they had never heard Penters making comments that could be construed as sexist. There are at least two problems with defendant's argument. First, defendant asks that the testimony of its witnesses be viewed as uncontradicted, even though plaintiff testified that Penters continued to make similar comments in 1998, 1999 and 2000, although she conceded that the comments had "lessened" in 2000. Trial Tr. Day One, dkt. # 123, at 200. As noted above, it was the province of the jury and not this court to determine the credibility of the witnesses.

■ Also, I disagree with defendant that a gender-related comment is inadmissible unless it was made at the same time and in relation to the employment decision, although I recognize that some cases seem to support this view. *See, e.g., Geier v. Medtronic, Inc.,* 99 F.3d 238, 242 (7th Cir. 1996) ("To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process.") (citing *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring)); *McCarthy v. Kemper Life Insurance Cos.,* 924 F.2d 683 (7th Cir.1991). However, the stated authority for this view, Justice O'Connor's concurring opinion in *Price Waterhouse,* does not support it. In *Price Waterhouse,* Justice O'Connor focused on comments that are *direct evidence* of discrimination, meaning that they prove without inference that an illegitimate criterion was a substantial factor in the employer's decision. There is nothing in her opinion suggesting that remarks that fail to meet the standard for direct evidence become *irrelevant.* Indeed, the plurality suggested that even if a comment does not prove discrimination by itself, it may be circumstantial evidence "that gender played a part." *See id.* at 251, 109 S.Ct. 1775 (plurality opinion). In more recent cases, the Court of Appeals for the Seventh Circuit has recognized that even comments not made "in temporal proximity to the employment action" or "in reference to that action" may be probative of discrimination, though, standing alone, they are insufficient to prove the plaintiff's case or even to shift the burden of persuasion to the defendant. *Schuster v. Lucent Technologies,* 327 F.3d 569, 576 (7th Cir.2003); *Gorence v. Eagle Food Centers, Inc.,* 242 F.3d 759, 762 (7th Cir.2001); *see also Futrell,* 38 F.3d at 347 (rejecting view that discriminatory remarks are not probative unless made "within the context of the employment decision in question"). To the extent that *Geier* is inconsistent with *Schuster* and *Gorence,* it is the later cases that I must follow.

■ Of course, the older and more tangentially related the comment is, the less probative value it has. *Schuster,* 327 F.3d at 576. But this is generally an issue that goes to the weight and not the admissibility of the evidence. If the question were whether one sexist comment made in 1997 was admissible to prove discriminatory intent, I would agree with defendant that its probative value would be substantially outweighed by unfair prejudice to defendant. However, I cannot conclude that the comments are irrelevant or unfairly prejudicial when plaintiff testified that they were part of a long pattern that continued through 2000. Even Penters's testimony that he stopped making comments in 1997 included the caveat that they ceased only because his wife "got fed up with blonde jokes" and not because he concluded that they were inappropriate or offensive. Thus, although Penters's comments at district sales meetings would not prove discrimination by themselves, at the very least the jury was entitled to consider them for the purpose of interpreting Penters's statement to plaintiff, "You have kids," a comment that was both related to and contemporaneous with the promotion decision.

Next, defendant argues that any statements made by Penters are irrelevant because there is no evidence that the final decision maker, Boulden, endorsed them. As I noted in the opinion and order denying defendant's motion for summary judgment, even if Boulden did not share Penters's views, Penters's statements are relevant if he was involved in the promotion decision or if his views tainted Boulden's decision. *David,* 324 F.3d at 861 (holding that jury could consider actions of those who did not make final de-

cision when they made recommendations for promotions); *Russell v. Board of Trustees of University of Illinois,* 243 F.3d 336, 342 (7th Cir.2001); *Hoffman v. MCA, Inc.,* 144 F.3d 1117, 1122 (7th Cir. 1998); *Futrell,* 38 F.3d at 347; *see also Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 50 (1st Cir.1999) ("Title VII extends to a neutral employer decision-making process that relies on discriminatory evaluations."). It was undisputed that Boulden had little direct contact with sales representatives in Penters's district (he was in Wisconsin a total of three times in 1999 and 2000), Trial Tr. Day One, dkt. # 123, at 53, suggesting that he relied heavily on Penters's suggestions. This inference is further supported by Boulden's decision to promote West, whom Penters recommended. In addition, Penters testified that Boulden "takes everything I say quite seriously." Trial Tr. Day Two, dkt. # 115, at 62. This is sufficient to allow a reasonable jury to impute Penters's attitude to defendant.

■ Finally, defendant contends that the comments could not be considered probative because plaintiff did not complain about them at the time they were made. However, plaintiff explained that the reason she did not complain earlier was that she was worried about retaliation. More important, although an employee's reaction to sexist comments could be relevant in a sexual harassment case, *see Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), her reaction in a disparate treatment case such as this one is of little consequence, if any. The issue for the jury was not whether plaintiff was upset by Penters's comments, but whether they were probative of Penters's intent when he chose not to recommend plaintiff for the Bedding Experts position. Whether *plaintiff* took action after hearing Penters's comments sheds little light on what *Penters* intended. Penters comments were admissible and they

support an inference that his decision not to recommend plaintiff for the Bedding Experts position was gender-related.

2) second reason: not a good fit

■ Penters's second articulated reason for not choosing plaintiff for the Chicago promotion was less clear. Penters testified that "Bedding Experts was not a place where [plaintiff] could have thrived, where she could have been productive for herself and productive for Sealy Mattress Company, and it would not have been the right place for her to be." Trial Tr. Day Two, dkt. # 115, at 99. When asked by defense counsel why he came to that conclusion, he answered, "That conclusion is just based on my visitations, my working with [plaintiff], my working knowledge of her expertise and her capabilities over four years." *Id.* When asked to explain further, he finally responded that plaintiff was "very directive," a style that worked with "smaller retailers" but "doesn't necessarily lend itself to the Bedding Experts type of an account." *Id.* at 100. He reiterated that the Bedding Experts account "would not have been a good fit" for plaintiff. *Id.*

Several pieces of evidence called this explanation into doubt. First, Penters did not make it clear *when* he decided that plaintiff's style would not "fit" with Bedding Experts. He testified that his "initial" reason for not choosing plaintiff was his perception that she did not want to move. It was only "later on" that he decided that West was better at "working with difficult buyers." Trial Tr. Day One, dkt. # 123, at 150. If "later on" meant after he had made his decision to recommend West instead of plaintiff, this consideration is not even relevant. Second, this explanation suggests that Penters believed that plaintiff was not qualified to be promoted *at all* because she could not handle

large retailers. But this would be inconsistent with the belief Penters expressed as early as 1998 that plaintiff should be promoted to key account manager, a position that involved handling larger retailers. This explanation is further undermined by the absence of any comments in Penters's evaluations of plaintiff suggesting that her style was too "directive" or that she was unable to handle larger accounts.

An alternative explanation argued by plaintiff is that defendant believed plaintiff would not have made "a good fit" because he thought the Bedding Experts account would be more appropriately handled by a man. Several witnesses testified about the "rough" behavior of associates at Bedding Experts. Boulden stated that Bedding Experts had "a rough and tumble street-level mentality or culture." Trial Tr. Day One, dkt. # 123, at 100. Penters testified that the employees at Bedding Experts used "raw language" such as "screw," "fuck" and "blow job." Trial Tr. Day Two, dkt # 115, at 123. West stated that Bedding Experts was "a lot of single young men" and a "rougher type of crowd." Trial Tr. Day Two, dkt. # 115, at 223. Roberts agreed that Bedding Experts "tends to be ... single, male, young associates" who are "a little more vulgar" than associates at other accounts. Trial Tr. Day Two, dkt. # 115, at 243.

Penters admitted that he considered the character of the Bedding Experts account in deciding not to recommend plaintiff for the promotion. However, he testified that his concern was based not on plaintiff's sex, but on her inability to "handle those kinds of situations," meaning sexually inappropriate behavior from clients. Trial Tr. Day Two, dkt. # 115, at 135. He cited an incident from 1997 involving a client named Larry Sikers. During a business meeting with plaintiff, Sikers began talking graphically about his sex life and about a strip bar that he owned. Plaintiff at-

tempted to redirect the conversation several times, but Sikers was insistent, telling plaintiff, "How dare you interrupt me?" After he rolled up the agenda and threw it at plaintiff, she walked out of the store. Plaintiff testified that when she complained to Penters, his first response was, "You know what? There's always two sides to the story." Trial Tr. Day One, dkt. # 123, at 205. Penters took plaintiff off the account and gave it to a man. Penters testified that this incident was part of the reason he concluded that plaintiff would not be a "good fit" for the Chicago promotion. Trial Tr. Day Two, dkt. # 115, at 136.

Penters's stated reliance on this incident brings up an interesting question: may an employer deny a promotion to woman who complains of sexually inappropriate behavior or harassment if it believes that the new position might subject her to further harassment? I am reluctant to say that an employee's complaint of harassment is a legitimate reason for choosing not to consider an employee for a promotion, even if the employer believes that it is acting in the employee's best interests. To say the least, it would be unfortunate that a woman would be required to refrain from objecting to sexually inappropriate behavior, no matter how abusive and demeaning it was, in order to advance her career. At the same time, I am aware of the financial realities businesses face. The need to placate a customer is not necessarily extinguished just because that customer acts inappropriately. Behavior that could never be tolerated from a supervisor or co-worker may have to be endured from clients or customers. Thus, a belief that an employee could not tolerate sexist customers could be a legitimate reason for choosing not to place that employee on an account with sexist customers.

What an employer may not do, however, is assume that all women will be ineffective with "single young men" or that all women need to be protected from men who use "raw language." One reasonable inference that the jury could have drawn is that the incident with Sikers caused Penters to believe that plaintiff would be unable to work with the associates at Bedding Experts. However, it is not the only reasonable inference it could draw. First, the jury could have taken into account Penters's failure to identify the "Sikers incident" as a factor in his decision not to recommend plaintiff until he was directed to do so by defense counsel. Even when asked directly by defense counsel whether the incident "played a role" in his decision, Penters began by stating, "I don't know that it played a direct—." He then stopped and went on to explain why he did think it played a role. Trial Tr. Day Two, dkt. # 115, at 103. Second, the incident with Sikers was one event occurring three years before the promotion decision. Trial Tr. Day One, dkt. # 123, at 205. Defendant adduced no evidence that plaintiff had any difficulties "handling" sexual comments from men before or after that time, though she testified that she continued to receive them from clients while working at Sealy. Trial Tr. Day Three, dkt. # 124, at 112. In fact, plaintiff testified that she had been handling the Sikers account for five years before the incident without a problem. Third, the Sikers incident went beyond vulgar language and sexual innuendos. Sikers ignored plaintiff's repeated attempts to direct the meeting back to business and he became so agitated that he began throwing things. It is not necessarily reasonable to infer from this that plaintiff could not deal with men in the "rough and tumble" atmosphere of Bedding Experts.

Of course, as defendant points out, its reasons do not have to be accurate, only non-discriminatory. See Jordan v. Summers, 205 F.3d 337, 343 (7th Cir.2000). However, the importance of the Sikers incident to Penters is called into question by the lack of any evidence that Penters told plaintiff that he believed she handled the incident incorrectly or instructed her on how she could have reacted differently. Instead, he simply replaced her with a man. Further, if Penters's rush to judgment about plaintiff's "style" was a result of her gender, this again is sex stereotyping. A conclusion that Penters was doing this is supported by the fact that no woman at Sealy has ever held the Bedding Experts position. Trial Tr. Day Two, dkt. # 115, at 126. Although Penters testified that he believed Josie Roberts would have been successful at Bedding Experts, he also admitted that he did not recommend Roberts for the position, even though she called him to express interest in the position when West did not. Trial Tr. Day Two, dkt. # 115, at 93. From this and the evidence that Penters did have stereotypical views about women, a reasonable jury could find that one incident over a period of eight years would not have motivated Penters's decision and that it was plaintiff's gender and not her ability that led him to believe that she was not a "good fit" for the Bedding Experts account. (Defendant argues that Penters's belief about plaintiff's ability to handle the Bedding Experts account was confirmed by her testimony that she found Penters's comments at district meetings to be "upsetting." Dft.'s Br., dkt. # 110, at 7. However, plaintiff testified that she thought the comments were "offensive," not upsetting, and there was no evidence that she was unable to work with Penters because of these comments. More important, plaintiff's reaction to Penters's comments are not relevant because Penters was not aware of how she felt until after he made his decision to recommend West.)

Despite the evidence that Penters's decision was gender-related, defendant argues that a reasonable jury could not infer discrimination on the part of Penters because he was plaintiff's "biggest booster" and he had actively sought to obtain a promotion for her in the past. There are several problems with this argument. First, as I noted in the opinion denying summary judgment, although evidence of Penters's past support of plaintiff was relevant, it does not entitle defendant to judgment as a matter of law. The jury is not required to disregard evidence supporting plaintiff's claim simply because other evidence supports defendant's position.

■■■ Second, it does not necessarily follow that because Penters had been supportive of plaintiff, he would not discriminate against her. Plaintiff argued at trial that Penters had made false assumptions about her because she was a woman, not that he hated her or thought women were incompetent. It is unlikely that many employment decisions today are made with that type of total animus or hostility toward a group. Even 30 years ago, the Supreme Court recognized that although discrimination against women in the workplace was still "pervasive," it was nevertheless "more subtle." *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Sex discrimination covers more than just refusing to promote a female employee out of a hatred or hostility for women. Paternalism is no less illegal than animus under Title VII if it denies a woman an opportunity that she otherwise would have received. *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634 (7th Cir.1996) ("paternalistic reason[s]" for denying promotion, such as belief that job is "too confrontational or unpleasant for a woman" will not "withstand scrutiny" under Title VII); *see also Thomas*, 183 F.3d. at 58 (holding that Title VII prohibits decisions based on "unthinking stereotypes or bias"). A general support

for plaintiff would not be inconsistent with a failure to consider her out of a belief that her family limited her desire to move or that women should be protected from sexually inappropriate behavior.

Third, although Penters had supported plaintiff generally, there was no evidence that he was ever asked to choose between recommending plaintiff or a male. When presented with the choice, Penters chose the male, even though his evaluations of plaintiff were equal to or more favorable than his evaluations of West and even though she had two years more experience than West as a territory manager 2. Although plaintiff's qualifications were not so superior to West's that this evidence, standing alone, would be sufficient to prove plaintiff's case, it is nonetheless relevant that Penters chose West over plaintiff despite their similar qualifications. *David*, 324 F.3d at 862 (rejecting interpretation of *Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir.2002), that relative qualifications of candidates are not relevant unless "the differences between the two candidates are so favorable to [the plaintiff] that there can be no dispute among reasonable persons of impartial judgment that [she] was clearly better qualified" for the position).

Finally, defendant asserts that it would be unreasonable to infer that Penters made his decision on the basis of sex stereotypes because there were males at Sealy with families who chose not to move to receive promotions and there were women with families who did move. This argument fails because Penters never testified that he did or did not consider these individuals for promotions because of his beliefs about their families. Defendant refers to Paula Lindstrom and Rebecca Woods, but neither of these employees worked in Penters's district and he had no say in their transfers. Defendant also points to David Feit, who lives in Rock-

ford, Illinois. Although Penters testified he believed Feit had "no desire to move anywhere in the country," he did not testify that he failed to consider Feit for a promotion because of his family. Trial Tr, Day Two, dkt. # 123, at 82. Therefore, the experiences of these three employees at Sealy are not helpful in determining Penters's intent.

### b. Boulden's reasons for not choosing plaintiff

Plaintiff presented sufficient evidence at trial to allow a reasonable jury to find that Penters's decision not to recommend plaintiff was gender-related and that Boulden's final decision was tainted by Penters's stereotypical attitudes. Even limiting consideration to Boulden's articulated reasons for not choosing plaintiff without regard to Penters's input, I conclude that there was sufficient evidence to allow the jury to find that Boulden's reasons were a pretext for discrimination.

### 1) first reason: interpersonal skills

■ Boulden's primary articulated reason for denying plaintiff the promotion was that he believed she had deficiencies with her interpersonal skills. In support of this belief, he cited an issue that arose while plaintiff was working on the Steinhafels account. (Boulden also noted that he had received a complaint about plaintiff from the controller at defendant's plant in Batavia, Illinois. However, he testified that it "wasn't that big of a deal," and admitted that plaintiff had received a rating of "commendable" for her communication with plant personnel in 1999–2000. Therefore, the jury was entitled to find that any complaint that Boulden received from the plant did not motivate his decision.) In spring 1999, Boulden had a meeting with Gary Steinhafel, who told Boulden that he was concerned about the relationship between plaintiff and the buyer for Steinhafels, Cathy Luling. Steinhafel told Boulden that he was concerned because they "had not become friendly with each other" and he thought that it was not "fostering a good business climate." Trial Tr. Day Two, dkt. # 115, at 176. From this conversation, Boulden concluded that "he had an aggressive rep. that perhaps had crossed the line." Trial Tr. Day Three, dkt. # 124, at 13.

A problem with Boulden's reliance on a belief that plaintiff was too "aggressive" is that it was undisputed that defendant *taught* its employees to be aggressive. *See* Trial Tr. Day One, dkt. # 123, at 186; (testimony of plaintiff); *id.* at 155 (testimony of Scott Penters). The court of appeals held that when an employer requires aggressiveness in its employees and then penalizes a woman for expressing it, this may be evidence that the employer was engaging in sex stereotyping because aggressiveness is often viewed as a desirable quality in men but not in women. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir.2000) ("While it is permissible to evaluate an employee's interpersonal skills when those skills are relevant to the job, evaluations may demonstrate discriminatory intent when employees are evaluated on how their interpersonal skills match stereotyped, unequal ideas of how men and women should behave."). As the Supreme Court stated in *Price Waterhouse*, 490 U.S. at 251, 109 S.Ct. 1775, "An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind." A difference in this case is that it was not only Boulden who viewed plaintiff as too aggressive, but the Steinhafels buyer as well. *See* Trial Tr. Day Two, dkt. # 115, at 197 (testimony of Cathy Luling) ("I view Tracey as an aggressive person."). Again, even if Luling would have been

more receptive to an "aggressive" man, this does not necessarily mean that defendant must disregard a customer complaint.

However, plaintiff presented evidence showing that issues with the Steinhafels account may not have determined Boulden's decision. First, Steinhafel did not testify that he viewed his discussion with Boulden about plaintiff and Luling as a "complaint." Rather, he testified that he thought plaintiff's aggressive personality was a positive. Trial Tr. Day Two, dkt. # 115, at 192. Although he told Boulden that he was concerned about developing the relationship between plaintiff and Luling, he also testified that it was Luling, not plaintiff, that was resistant to developing a relationship. *Id.*

Perhaps Boulden agreed that Luling was the source of the problem but he did not care. Regardless who caused the breakdown, Boulden may have believed that it was plaintiff's responsibility to fix the situation and that it represented a failure on her part when outside help was needed to resolve the issue. Even if such a belief would be unreasonable or unfair, it would not be illegal unless Boulden did not make the same demands of men. However, to the extent that Boulden honestly believed that it was plaintiff's fault for failing to establish a relationship, there was evidence that by the time Boulden made the promotion decision (one year later), the problem had resolved and Steinhafel had told Boulden that the relationship had improved. Although Boulden was entitled to consider even past problems that plaintiff had, West's evaluations showed that he had had problems with interpersonal skills in the past, which would undermine any assertion that Boulden was unwilling to overlook past deficiencies. *See* West Performance Appraisal 4/98—4/99, Dft.'s Exh. 210 (noting need for development in communication skills, problems with "finger pointing" and failure to

"think before he speaks"). Even West's 2000 evaluation noted that a number of other concerns remained. *See, e.g.,* West Performance Appraisal 4/99–4/00, Dft.'s Exh. 211 (noting failure "to be proactive in developing responses to challenges that arise"). Although these issues were not necessarily related to interpersonal skills, they demonstrate that even an employee with remaining performance issues could be promoted.

Boulden's stated reason is called into question further by his decision to promote plaintiff only two months after she was rejected for the Chicago position. Two days after Boulden learned of plaintiff's accusation of sex discrimination, he decided to offer her a promotion on the American TV account, even though he still had reservations about her interpersonal skills, which he believed were exacerbated by her failure to complain earlier about Penters's gender-related comments and by her decision to file a gender discrimination complaint before coming to him with her complaints. Trial Tr. Day One, dkt. # 123, at 122; Trial Tr. Day Three, dkt. # 124, at 99. A reasonable jury could have found that an employer with nothing to hide would not have made such an abrupt about-face.

In its reply brief, defendant suggests that permitting the jury to infer discrimination from its later decision to promote plaintiff will "undermine" women's rights under Title VII because "[n]o company will lightly promote any woman who has complained of discrimination if doing so will serve as a basis for liablity." Dft.'s Reply Br., dkt. # 122, at 1. Although this argument has surface appeal, it is ultimately unavailing. First, there is little chance that upholding the jury's verdict in this case will encourage employers not to promote women. The inference of discrimination arises not from defendant's decision to

promote plaintiff but from its failure to do so until she complained of sex discrimination. If permitting such an inference "undermines" anything, it is an employer's practice of making promotion decisions based on irrelevant criteria, whether that be an employee's sex or the fact that an employee has made an accusation of discrimination.

Further, the question is not whether the jury's decision will make it easier for women to obtain promotions in the future but only whether the inference drawn by the jury was a reasonable one. It is reasonable to expect that employers will promote their employees when they have earned a promotion and not just because they have complained about unfair treatment. When an employer that has just concluded that an employee should not be promoted changes its mind immediately after being accused of violating the law, I cannot say that it is unreasonable to discredit the employer's stated reasons for not offering the promotion in the first instance.

2) second reason: willingness to move

■ A second reason Boulden cited was that he believed plaintiff did not want to move. Whether this belief actually motivated his decision not to promote plaintiff is called into question by his own testimony that he did not give "serious consideration" to plaintiff's willingness to move because "she was not a candidate for the job." Trial Tr. Day One, dkt. # 123, at 84. Regardless, plaintiff presented sufficient evidence to allow the jury to conclude reasonably that this explanation was pretextual.

The evidence on this point has not developed significantly since summary judgment. In concluding that plaintiff did not want to move, Boulden relied on plaintiff's relocation chart. However, the chart indicated that plaintiff wrote an "A" in the column labeled "CHI." An "A" indicates that it is the employee's first choice for relocation. Boulden testified that "CHI" meant Chicago/Wisconsin district and that he interpreted plaintiff's marking as wanting to stay in Madison. The jury could have reasonably disbelieved this explanation for several reasons. First, as plaintiff points out, Boulden's stated interpretation belies the very nature of a "relocation" chart. If the purpose of the chart is to determine where an employee is interested in moving, it makes little sense to view a mark in the Chicago box as being unwilling to move anywhere rather than being willing to move to Chicago. It is true that plaintiff indicated on the chart a lack of interest to move many places in the country. However, she did indicate she would be willing to move to Arizona and Florida as well, which should have communicated to Boulden that she was not opposed to moving. If Boulden's position was that an employee could communicate on the chart a willingness to move within his or her *own* district only by indicating a willingness to move to *numerous* other districts, he did not explain the logic of this reading. The jury was entitled to find that Boulden's failure to adopt the most straightforward interpretation of the chart undermined his assertion that plaintiff's unwillingness to move was the reason plaintiff was passed over for the promotion.

Again, defendant argues that it was unreasonable for the jury to find that Boulden considered plaintiff's gender in making his decision because he considered another woman, Amanda Pierce, for the Bedding Experts position, and he has promoted other females in the past. With respect to Pierce, evidence that Boulden *considered* a female for the position is not probative of his intent when he *offered* the position to a male. Although Boulden ultimately offered Pierce a key account manager position in Chicago, this was not until soon

after plaintiff complained of discrimination. Another female identified by Boulden, Paula Lundstrom was given a *lateral* transfer in 1999. This leaves Rebecca Woods, who was promoted to key account manager in 1999, and Josie Roberts, whom Boulden promoted to territory manager 2. (Roberts was later promoted to key account manager, but Boulden's role in this decision is unclear and, in any event, defendant promoted Roberts after plaintiff's complaint of discrimination.) One promotion of a woman to key account manager is hardly compelling evidence of an absence of sex discrimination and certainly not enough to require the jury to find in defendant's favor. *See Sheehan*, 173 F.3d at 1045 ("That [the defendant] had *not* fired several women who did become pregnant goes only to the weight [of the evidence] and does not show that the jury was irrational for concluding that he did fire [the plaintiff] because she was pregnant.")

Finally, defendant argues that there was no reasonable inference of sex discrimination because defendant was making plans to promote plaintiff at the time it promoted West. Boulden testified that around the time he decided to promote West from the American TV account to the Bedding Experts account, Penters approached him about giving the American TV account to plaintiff, with the expectation that the territory would soon qualify as a key account. Trial Tr. Day Three, dkt. # 124, at 35. Although Boulden said he agreed to this plan, he wanted to wait to give plaintiff the promotion until after she had proven that she could improve her "relationship building" skills and until American TV opened stores in Iowa. Trial Tr. Day Three, dkt. # 124, at 37–38.

There are at least two problems with defendant's argument. First, an employer cannot avoid liability for one discriminatory decision by offering an employee another promotion. Second, defendant presented no evidence other than Boulden's testimony that giving plaintiff a promotion was his plan all along. He did not tell plaintiff of this plan until after she complained of gender discrimination and there are no documents prepared before plaintiff's complaint that support the plan's existence. Penters's failure to inform plaintiff about this plan is particularly surprising in light of his previous decision in fall 1999 to tell plaintiff without confirming it with Boulden that she would be promoted to key account manager soon. Further, Boulden's testimony was undermined by plaintiff's, who stated that Penters had told her in August 2000 that the American TV account was "unpromotable." Trial Tr. Day One, dkt. # 115, at 214. In addition, West testified that, before he accepted the Bedding Experts position, Boulden told him that he could not be promoted to key account manager if he stayed with the American TV account. Trial Tr. Day Two, dkt. # 115, at 236. If the territory plaintiff received was viewed as "unpromotable" by both Penters and Boulden, it is difficult to believe defendant's assertion that Boulden had plans from the beginning to promote plaintiff on that account. Boulden admitted that *one day* before he decided to promote plaintiff, he was still "unsure" whether plaintiff was an appropriate candidate for key account manager. The jury was not required to view Boulden's testimony regarding his plans for plaintiff as conclusive proof that his decision was not discriminatory.

In sum, I disagree with defendant that plaintiff has done no more than " 'argue that the jury might have chosen to disbelieve all of the defendant's evidence.' " Dft.'s Reply Br., dkt. # 122, at 2 (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir.2002)). Although plaintiff's evidence could have been stronger, defendant

has not shown that it is appropriate in this case to disregard the jury's findings. *See Massey*, 226 F.3d at 925 ("[T]he jury is the body best equipped to judge the facts, weigh the evidence, determine credibility, and use its common sense to arrive at a reasoned decision."); *Tincher v. Wal–Mart Stores, Inc.*, 118 F.3d 1125, 1131 (7th Cir. 1997) (concluding that evidence of pretext was "tenuous" but affirming verdict in favor of plaintiff while noting that courts "have a duty to respect the factfinder's credibility determinations and refrain from weighing the evidence ourselves in an attempt to reach our own conclusion"). There was sufficient evidence for the jury to find that defendant's reasons for not promoting plaintiff were pretextual and that defendant discriminated against plaintiff because of sex. Accordingly, defendant's motion for judgment as a matter of law will be denied with respect to liability.

### 2. *Rule 59 motion*

■ A court may grant a new trial if the verdict is against the clear weight of the evidence or if the trial was unfair to the moving party. *David*, 324 F.3d at 863. Defendant argues both that the jury's verdict is against the weight of the evidence and that the trial was unfair as a result of several erroneous evidentiary rulings. However, its argument that the verdict contradicts the evidence is no more than a rehash of its arguments in support of its Rule 50 motion that need not be addressed again. *See Emmel*, 95 F.3d at 636 (choosing not to discuss argument that verdict was against the weight of the evidence when court had rejected defendant's arguments under Rule 50). Although the standards for Rule 59 and Rule 50 are not identical, *see* 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2806 (2d ed.1995), defendant has not persuaded me that its case was so strong that the verdict against it was unfair. Similarly, I am not persuaded that judgment with respect to liability should be amended under Rule 59(e) or that relief from judgment under Rule 60(b)(6) is appropriate. Therefore, defendant's motions for a new trial and to amend the judgment will be denied with respect to the jury's findings on liability.

■ Defendant identifies four errors in the admission and exclusion of evidence: (1) Boulden was not allowed to testify whether he would have considered plaintiff for the Bedding Experts position if Penters had recommended her; (2) memos written by Boulden were excluded on hearsay grounds; (3) Penters was not allowed to explain his statement that "we wouldn't be here today" if he had asked plaintiff whether she was interested in the Bedding Experts position; (4) comments allegedly made by Penters at district sales meetings were not excluded, even though they dated back to 1997. Rulings on evidentiary issues are discretionary and will not be overturned absent an abuse of discretion. *Manuel v. City of Chicago*, 335 F.3d 592 (7th Cir.2003). An erroneous evidentiary ruling merits a new trial only if it had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Young v. James Green Management, Inc.*, 327 F.3d 616, 623 (7th Cir.2003) (quoting *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir.1998)). I addressed defendant's arguments regarding Penters's comments in the context of discussing defendant's Rule 50 motion so it is unnecessary to reconsider those arguments here. I will address each of defendant's remaining asserted errors in turn.

### a. Effect of Penters's recommendation on Boulden's decision

■ On direct examination, defense counsel asked Boulden, "If [Penters] had recommended [plaintiff for the Bedding Experts position], would that have affected

your decision?" Boulden answered, "I would have given her consideration. I would have taken time, I'm sure, to think it through. I would have asked Scott to explain it first. Help me understand, you know, what's your rationale, and give him a chance to sell to me. From the bottom of my heart, I would have—." Trial Tr. Day Three, dkt. # 124, at 33. At this point, plaintiff's counsel objected to further questioning on the grounds of speculation and I sustained the objection.

The source of defendant's disgruntlement on this issue unclear. Boulden was able to answer defense counsel's question in large part and what he did say was not helpful for defendant: he admitted that a different recommendation from Penters could have made a difference. Even if such testimony was not speculative (and his testimony suggests strongly that he *was* speculating), I do not see how exploring the topic further would have been useful to defendant's case.

The case defendant cites to support its argument, *Shick v. Illinois Department of Human Services,* 307 F.3d 605 (7th Cir. 2002), bears no relation to this case. In *Shick,* the plaintiff sued his employer under Title VII and the Americans with Disabilities Act, alleging both sex and disability discrimination. A jury found in favor of the plaintiff on both claims, awarding him more than $5 million. The district court vacated the verdict with respect to the disability claim because the court of appeals had held that the ADA is not a valid abrogation of state sovereign immunity. In a split decision, the court of appeals concluded that the defendant was entitled to a new trial on the Title VII claim because most of the plaintiff's evidence of discrimination went to the disability claim, which might have led the jury to base its finding of sex discrimination on evidence that was no longer relevant. *See id.* at 614 ("[G]iven the overwhelming evidence of the

abusive treatment regarding Shick's disabilities and the prejudicial effect of this evidence, the limited evidence of sex discrimination was tainted beyond repair, absent a new trial.")

Although the importance of Penters's input was a significant issue, defendant has not persuaded me that prohibiting Boulden from speculating further was error or that allowing additional testimony would have had a substantial influence on the jury's determination.

b. Boulden's memos

■ During direct examination of Boulden, defense counsel moved for admission of three memos Boulden had written shortly after learning of plaintiff's accusation of sex discrimination. Plaintiff objected on hearsay grounds and I sustained the objection. Defendant advances several arguments why the documents should not have been excluded: they were business records, they were present sense impressions, they were not offered for their truth. Although I find defendant's arguments on each of these points dubious, I need not linger on whether it was error to exclude these memos because, again, I am not convinced that their inclusion would have influenced the jury. Although defendant argues that the exclusion of the memos was "highly prejudicial," it does not explain *how* it was prejudicial. The closest defendant comes is to argue that plaintiff was able to question Boulden about these memos "out of context" and that her counsel "mischaracterized the contents of at least one of these exhibits in the closing." Dft.s' Reply Br., dkt. # 122, at 20. Defendant does not explain how plaintiff's counsel mischaracterized the contents of the memo or how counsel's use of the memos confused the jury. By failing to develop its argument on this point, plaintiff has waived it. *See Central States, Southeast*

*and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.,* 181 F.3d 799, 808 (7th Cir.1999). More important, defendant was allowed to examine Boulden regarding the events referred to in these memos. "[T]here is no reason to believe that the jury would have given greater weight to [Boulden's] unsworn out-of-court statement than to his sworn testimony in court." *Young,* 327 F.3d at 623.

c. Penters's testimony

■ Plaintiff asked Penters the following question at trial: "Would it be fair to state that all you had to do was pick up a phone, or the next time you saw Ms. Lust, is ask her, 'Tracey, are you interested in the Experts position?' That's all you would have had to have done, correct?" Penters responded, "Probably if I asked that question, we probably all would not be here today." Trial Tr. Day One, dkt. # 123, at 168. The following day, when defendant asked Penters to further explain his answer, plaintiff objected and the objection was sustained on grounds of relevance and speculation. Trial Tr. Day Two, dkt. # 115, at 105.

I disagree with defendant that this ruling was an error. Penters had no way of knowing how plaintiff would have responded if he had asked her whether she was interested in the Bedding Experts position and he had already testified why he believed plaintiff was not interested in moving. Further, defendant cannot argue that plaintiff "opened the door" to this line of questioning. Penters's answer that "we probably wouldn't be here" was nonresponsive to plaintiff's question, which required only a yes or no. Defendant could have objected at that point and asked that the jury disregard the answer, but it failed to do so. Thus, there was no reason to allow Penters to speculate further.

Also, I am not persuaded that defendant was harmed by its failure to question Penters further on this topic. Penters had already explained that he believed he was "mostly responsible" for plaintiff's lawsuit because he did not realize her "dee[p] desire" to become a key account manager. Trial Tr. Day One, dkt. # 123, at 177. Defendant cannot argue successfully that any attempt to contradict this statement the following day would have significantly influenced the jury's decision.

Defendant is not entitled to a new trial as a result of errors on evidentiary rulings.

## II. DAMAGES

### A. *Rule 50 Motion*

■ Defendant failed to move for judgment as a matter of law on damages after plaintiff's case or after the close of all the evidence. Although plaintiff neglected to raise this issue with respect to liability, it argues in its brief that defendant's failure to move for a directed verdict on damages precludes review of the jury's findings on damages under Rule 50. I agree. *See Laborers' Pension Fund v. A & C Environmental, Inc.,* 301 F.3d 768 (7th Cir. 2002); *Mid–America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1363–64 (7th Cir.1996); *Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1139–40 (7th Cir.1994). Defendant's reliance on *Urso v. United States,* 72 F.3d 59, 61 (7th Cir. 1995), is misplaced. In that case, the defendant moved for judgment as a matter of law under Rule 50 both at the close of the plaintiff's case and at the end of trial. The issue was only whether the defendant had developed its argument sufficiently and the court concluded that it had. I conclude that defendant's failure to move for judgment as a matter of law requires denial of that motion with respect to damages.

### B. *Rule 59*

■ Although defendant has waived its right to move for judgment as a matter of

law, I may nevertheless grant its motion for a new trial or its motion for remittitur. *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2539, at 362 (2d ed.1995) (if party fails to move for judgment as a matter of law during trial, court may still grant relief under Rule 59). Defendant argues that the jury's awards of both punitive damages and damages for emotional distress were against the greater weight of the evidence. Alternatively, it argues that both awards were excessive and should be reduced substantially.

### a. *Damages for emotional distress*

The jury awarded plaintiff $100,000 for emotional distress. Defendant contends that this award is "far out of proportion to the evidence presented at trial." Dft.'s Br., dkt. # 110, at 28. In determining whether the jury's award should be reduced, it is necessary to decide what effect if any 42 U.S.C. § 1981a(b)(3) had on the jury's award for emotional distress. As noted above, § 1981a limits recovery for emotional distress and punitive damages to $300,000 in a Title VII case. Plaintiff argues that the cap should be applied proportionately to both the punitive damages ($1,000,000) and the emotional distress damages. Thus, plaintiff suggests that § 1981a reduced both awards by 73%, leaving about $27,000 for emotional distress and $273,000 in punitive damages. (The exact figures would be $27,272.73 for emotional distress and $272,727.27 for punitive damages.) Defendant's position is that § 1981a reduced the punitive damages award only, leaving the emotional distress damages at $100,000.

Defendant chides plaintiff for failing to cite any case law supporting its position, but it overlooks its own failure to cite any authority that contradicts it. My own review of the case law reveals that there is nothing improper about plaintiff's suggested application of the damage cap. Although it appears that district courts often comply with § 1981a(b)(3) by reducing punitive damages only, *see, e.g., Gile v. United Airlines, Inc.,* 213 F.3d 365, 376 (7th Cir.2000), the court of appeals has made clear that the "statute contains no command as to how a district court is to conform a jury award to the statutory cap." *Jonasson v. Lutheran Child and Family Services,* 115 F.3d 436, 441 (7th Cir.1997) (affirming district court's decision to comply with § 1981a(b)(3) by reducing compensatory damages and leaving punitive damages intact). In the absence of a compelling reason why the statutory cap should apply to one form of damages and not to another in a particular case, I see no reason why § 1981a(b)(3) should not be applied proportionally to both damages for emotional distress and punitive damages. Defendant offers no argument to support its position that § 1981a(b)(3) should apply to punitive damages only except to state that $100,000 "must be" the appropriate guidepost. Dft.'s Reply Br., dkt. # 122, at 28. This is not persuasive. Therefore, in deciding whether the damages for emotional distress should be reduced, I conclude that the appropriate amount to consider is $27,000 rather than $100,000.

As was the case at trial, defendant fails to provide any amount that it believes would have been a reasonable amount. However, to support its argument that the jury's award was too high, defendant points out that there were no medical records demonstrating any emotional injury to plaintiff as a result of not being promoted. "It is well-settled that Title VII plaintiffs can prove emotional injury by testimony without medical support, although the lack of such evidence is nevertheless relevant to the amount of damages awarded." *David v. Caterpillar, Inc.,* 185 F.Supp.2d 918, 923 (C.D.Ill.2002)

(citing *Avitia v. Metropolitan Club of Chicago,* 49 F.3d 1219, 1227–29 (7th Cir.1995)); *see also Merriweather v. Family Dollar Stores of Indiana, Inc.,* 103 F.3d 576, 580 (7th Cir.1996). In this case, plaintiff testified that receiving a promotion to key account manager had been "extremely important" to her and that she had been looking forward to it since at least September 1999, when Penters told her that she would soon be promoted. Trial Tr. Day Four, dkt. # 118, at 14. She said that when she heard that she was not chosen for the promotion,

> that was a horrible blow in my life at the that time. I had worked through all of those years of being promised to be a key account manager to that point and understanding the career is my life and I have worked to that point, when that was told to me, it was the biggest blow I had experienced. It devastated me, absolutely devastated, immobilized me. I can't tell you in any other words what happened. Nonfunctioning I guess at that moment.

Trial Tr. Day Four, dkt. # 118, at 16. In addition, plaintiff said that she suffered from sleeplessness and anxiety attacks as a result of not getting the promotion. *Id.* at 17. Although there was only a two-month period between plaintiff's learning that she did not get the Bedding Experts position and being offered another promotion, plaintiff testified that she is still emotionally affected by not receiving the earlier promotion.

Admittedly, plaintiff's evidence of emotional distress is far from overwhelming. Unfortunately for defendant, however, the bar is not very high for receiving emotional distress damages. The court of appeals recently upheld a $50,000 award for a plaintiff in a sex discrimination case who testified she felt "robbed" and "cheated" when she did not receive a promotion, "like a truck had just run her over." *David,* 324 F.3d at 864. Like plaintiff, the

plaintiff in *David* did not have evidence of her emotional injuries beyond her own testimony. *See also U.S. EEOC v. AIC Security Investigations,* 55 F.3d 1276, 1285–86 (7th Cir.1995) (upholding award of $50,000 for emotional distress even though plaintiff did not seek professional treatment when he testified that he experienced "depression, rage and fear resulting from his sudden firing"); *Fleming v. County of Kane, State of Illinois,* 898 F.2d 553 (7th Cir.1990) (upholding award of $40,000 when plaintiff testified he was humiliated and depressed and suffered from headaches and sleeplessness). Considering the importance of plaintiff's job to her, the substantial amount of time she had waited to receive a promotion and the lingering effects of defendant's decision, I cannot conclude that an award of $27,000 is "monstrously excessive" or that it bears no rational relation to the evidence. *Liu v. Price Waterhouse, LLP,* 302 F.3d 749, 756 (7th Cir.2002). Therefore, I will deny defendant's motions for a new trial and to reduce the damages for emotional distress.

b. *Punitive damages*

The standard for obtaining punitive damages in a Title VII case is set forth in 42 U.S.C. § 1981a(b)(1). The plaintiff must prove that the defendant intentionally discriminated against her "with malice or reckless indifference to [her] federally protected rights." *Id.* In *Kolstad v. American Dental Association,* 527 U.S. 526, 534–35, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court rejected an interpretation of the statute that limited punitive damages to cases involving "egregious misconduct," holding instead that it was the employer's state of mind that determined the availability of punitive damages. Specifically, if an employer "discriminate[s] in the face of a perceived threat that its actions will violate federal law," a jury may award punitive damages.

*Id.* at 536, 119 S.Ct. 2118. Thus, unless the employer was "unaware of the relevant federal prohibition" or believed that its actions were permitted under law (because, for example, it believed its discrimination satisfied a bona fide occupational qualification), it may be liable for punitive damages. *Id.* at 537, 119 S.Ct. 2118. However, the Court also held that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII." *Id.* at 545, 119 S.Ct. 2118 (internal quotations omitted). The Court did not clarify the application of its "good faith" defense, but it is clear that it is not sufficient for a defendant to simply point to the existence of a nondiscrimination policy. *See, e.g., Fine v. Ryan International Airlines,* 305 F.3d 746, 755 (7th Cir.2002); *Bruso v. United Airlines, Inc.,* 239 F.3d 848, 858 (7th Cir.2001).

 In this case, there is no dispute that both Penters and Boulden knew that sex discrimination violated federal law. Neither testified that he believed sex was a bona fide occupational qualification for the Bedding Experts position. In arguing that punitive damages are not appropriate in this case, defendant repeats its arguments that Boulden did not know plaintiff wanted to move and that there was no evidence that Boulden discriminated against plaintiff because of her sex. However, I have already concluded that there was sufficient evidence to allow the jury to conclude that Boulden's reasons for not promoting plaintiff were pretexts for discrimination. Defendant must do more than reargue its liability case to receive a new trial on punitive damages.

Although defendant argues that the evidence at trial demonstrated that defendant enforced its nondiscrimination policy by promoting many women at the company, Boulden cited only three promotions, one of which occurred after plaintiff complained of discrimination and one of which was to a position below a key account manager. The fact that no woman has ever held the key account manager position for the Bedding Experts account further undermines defendant's argument that it makes good faith efforts to comply with Title VII. It is true that, after plaintiff complained, Boulden acted quickly to address the situation and shortly thereafter offered plaintiff a promotion. However, the court of appeals has recently rejected the argument that "good deeds taken by the employer after it has made an unlawful employment decision somehow insulate the employer from an award of punitive damages." *David,* 324 F.3d at 865. This would be especially true when the person doing the "good deed" is the same person who discriminated in the first place and thus could be trying to escape the consequences of his discriminatory decision. *See Bruso,* 239 F.3d at 860 n. 8 (noting case law that holds that good faith defense does not apply to senior management).

 Thus, the only question is whether the amount of the award is excessive. Although I do not believe that Boulden's actions in trying to address plaintiff's complaint of discrimination make defendant immune from a punitive damage award, I agree with defendant that its prompt response to the complaint was relevant evidence that the jury should have considered in determining an appropriate award. However, under § 1981a(b)(3) the award has already been reduced 73% to $273,000. "To argue over the fraction that remains could be viewed as denigrating the jury's very function in this trial." *EEOC v. CEC Entertainment, Inc.,* 10 AD Cases 1593 (W.D.Wis.2000). The egregiousness of the defendant's conduct is not

the only factor to be considered in deciding whether a punitive damages is excessive. The jury was required to consider what amount was necessary to deter defendant from engaging in similar conduct in the future. The court of appeals has stated that it will not set aside a jury's award of punitive damages unless it is certain that it exceeds what is necessary to serve the objectives of deterrence and punishment. *Worth v. Tyer*, 276 F.3d 249, 269 (7th Cir.2001). In light of the evidence that defendant had $1 billion in sales each year, I cannot conclude with certainty that an award of $273,000 is greater than what is necessary to deter defendant. Accordingly, defendant's motion for a new trial on the issue of punitive damages and its motion to reduce the punitive damage award will be denied.

### ORDER

IT IS ORDERED that

1. Defendant Sealy, Inc.'s motions for judgment as a matter of law under Fed. R.Civ.P. 50(b) with respect to liability and damages are DENIED;

2. Defendant's motions for a new trial under Fed.R.Civ.P. 59 with respect to liability and damages are DENIED; and

3. Defendant's motions to reduce the awards for compensatory and punitive damages are DENIED.